UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: THE MATTER OF SETTOON TOWING, LLC, AS OWNER AND OPERATOR OF THE M/V HANNAH C. SETTOON, PRAYING FOR EXONERATION FROM OR LIMITATION OF LIABILITY | CIVIL ACTION NO. 14-499 <br><br> JUDGE MILAZZO <br><br> MAGISTRATE JUDGE WILKINSON |

## SETTOON TOWING, LLC'S AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Settoon Towing, LLC ("Settoon") submits the following Amended Proposed Findings of Fact and Conclusions of Law accordance with this Court's Trial Preparation and Procedures dated November 19, 2015. (Rec. Doc. 94). In order for this Court to assess fault to Settoon in connection with the February 22, 2014 marine collision and subsequent oil spill involving the M/V HANNAH C. SETTOON and the M/V LINDSAY ANN ERICKSON, the Court must find that the words "Appreciate your patience there, LINDSAY ANN. Y'all have a good evening. The HANNAH." by the Captain of the M/V HANNAH C. SETTOON approximately two (2) minutes prior to the collision indicated to the Captain of the M/V LINDSAY ANN ERICKSON that the passing agreement had terminated and that the M/V HANNAH C. SETTOON had safely passed the M/V LINDSAY ANN ERICKSON on the river—and that the Captain and/or crew of the M/V LINDSAY ANN ERICKSON had seen the M/V HANNAH C. SETTOON safely pass given the clear visibility that day. This argument is simply not plausible.

## AMENDED PROPOSED FINDINGS OF FACT

I.    **THE PARTIES**

   A.    **SETTOON TOWING, LLC**

1.    Settoon Towing, LLC ("Settoon") was at all relevant times a limited liability company organized and existing under the laws of the State of Louisiana with its principal place of business located in Pierre Part, Louisiana.

2.    Settoon was at all relevant times the registered owner and/or operator of the tug M/V HANNAH C. SETTOON and the Barges E2MS-302 and E2MS-303. (Rec. Doc. 40, pp. 16-17).

3.    Settoon filed a Complaint for Exoneration from or Limitation of Liability as the owner of the M/V HANNAH C. SETTOON. (Rec. Doc. 1).  Settoon also filed a counterclaim against Marquette asserting a contribution claim for the recovery of amounts paid to E-Squared Marine, LLC, the owner of the Barge E2MS-303, for damages thereto, amounts paid and/or incurred in the cleanup and/or removal of the oil spill, and amounts paid to third party claimants as a result of the oil spill. (Rec. Doc. 9).

   B.    **MARQUETTE TRANSPORTATION COMPANY, LLC**

4.    Marquette Transportation Company, LLC ("Marquette") was at all relevant times a limited liability company, organized and existing under the laws of the State of Delaware with its principal place of business located in Paducah, Kentucky and its principal business establishment in Louisiana located in Jefferson, Louisiana.

5.    Marquette was at all relevant times the owner and/or operator of the M/V LINDSEY ANN ERICKSON and her flotilla of twenty grain barges. (Rec. Doc. 40, p. 17).

6.    Marquette filed an answer to and claim in Settoon's Complaint for Exoneration from or Limitation of Liability. (Rec. Doc. 7).

## II.     THE COLLISION AND OIL SPILL

7.  This limitation proceeding results from a February 22, 2014 marine collision and subsequent oil spill in the Lower Mississippi River involving the flotilla of the M/V HANNAH C. SETTOON, a Settoon vessel, and the M/V LINDSEY ANN ERICKSON, a Marquette vessel. (Rec. Doc. 40, pp. 16−17).

8.  The M/V HANNAH C. SETTOON is owned by Settoon. (Rec. Doc. 40, pp. 16−17).

9.  The M/V HANNAH C. SETTOON is a welded steel, inland push boat measuring 84.5' in length, 35' in width, and 10' in depth with a gross tonnage of 292 tons. (Testimony of Captain Tim Anselmi; M/V HANNAH C. SETTOON Certificate of Documentation).

10. The value of the M/V HANNAH C. SETTOON at the time of the collision was $5,000,000.00. (Testimony of Paul Deister).

11. The Barges E2MS-303 and E2MS-302 are owned by E-Squared, but were demise chartered to Settoon Towing. (Bareboat Charter Party Between Settoon Towing, LLC and E-Squared Marine, LLC).

12. The Barge E2MS-303 is a double hulled tank barge measuring 297.5' in length, 54' in width, and 12' in depth with a gross tonnage of 1619 tons. (Barge E2MS-303 Certificate of Documentation; Survey Report of Dufour, Laskay, & Strouse, Inc. dated March 16, 2014).

13.  On February 22, 2014, the M/V HANNAH C. SETTOON was headed southbound in the lower Mississippi River with two loaded barges in tow, the E2MS-303 and E2MS-302, both carrying Bakken crude oil for Settoon's customer, Valero. (M/V HANNAH C. SETTOON Daily Boat Logs and Electronic Vessel Logs; U.S. Coast Guard AIS Recordings; M/V HANNAH C. SETTOON Rosepoint Recordings; Demonstrative Video Depictions of Accident; Testimony of Captain Calvin Dean; Testimony of Capt. Pete Dolan; Testimony of Capt. Tim Anselmi).

14.  The crew of the M/V HANNAH C. SETTOON on this date was as follows:  Capt. L. J. Aucoin, Capt. Calvin Dean, Tankerman Ricky Griggs, Tankerman Kit Savona, Deckhand Justin Miller, and Steersman Steve Casenave. (M/V HANNAH C. SETTOON Daily Boat Logs and Electronic Vessel Logs; Testimony of Captain Calvin Dean).

15.  The M/V HANNAH C. SETTOON and the Barges E2MS-303 and E2MS-302 were en route from the NUStar Terminal in St. James, Louisiana and bound for the Valero Refinery in Meraux, Louisiana, just south of New Orleans. (M/V HANNAH C. SETTOON Daily Boat Logs and Electronic Vessel Logs; U.S. Coast Guard AIS Recordings; M/V HANNAH C. SETTOON Rosepoint Recordings; Demonstrative Video Depictions of Accident; Testimony of Captain Calvin Dean).

16.  At all material times, the M/V HANNAH C. SETTOON and the Barges E2MS-303 and E2MS-302 were seaworthy and fit for their intended uses. (River and/or Canal Charts; Navigational Chart No. 11360, 29th Edition; Testimony of Captain Calvin Dean).

17.  The M/V HANNAH C. SETTOON was equipped with up-to-date paper and electronic navigation charts. (River and/or Canal Charts; Navigational Chart No. 11360, 29th Edition; Testimony of Captain Calvin Dean).

18.  Captain Calvin Dean updates his Rose Point electronic navigational charts each time he time he boards the M/V HANNAH C. SETTOON. Dep. of Calvin Dean, pp. 93:15−94:10, 17−20 (stating that Capt. Dean updates his Rose Point each time he boards the vessel); 98:2−14 (Capt. Dean acknowledging that the electronic navigational chart reflected on Settoon's first Rose Point video playback, in contrast to what was on his vessel at the time of the collision, was not up to date); 119:12−120:11 (stating that Capt. Dean updates his Rose Point each time he board the vessel); 124:6−13 (same).

19. The Rose Point electronic navigational charts on the computer of the M/V HANNAH C. SETTOON were up to date on February 22, 2014 at the time of the collision. Dep. of Calvin Dean, pp. 93:15−94:10, 17−20 (stating that Capt. Dean updates his Rose Point each time he boards the vessel); 98:2−14 (Capt. Dean acknowledging that the electronic navigational chart reflected on Settoon's first Rose Point video playback, in contrast to what was on his vessel at the time of the collision, was not up to date); 119:12−120:11 (stating that Capt. Dean updates his Rose Point each time he board the vessel); 124:6−13 (same).

20. Regardless of any chart, Captain Dean was intimately familiar with this section of the river and navigated on this clear day by sight, using the navigational aids in the river as necessary. (Testimony of Calvin Dean).

21. All members of the crew of the M/V HANNAH C. SETTOON were competent, properly trained, and properly licensed. (Personnel Files of M/V HANNAH C. SETTOON crewmembers; Testimony of Captain Calvin Dean).

22. At approximately 14:58, the M/V HANNAH C. SETTOON was under the command of Capt. Calvin Dean and rounding College Point Bend, which is near Lower Mississippi River ("LMR") Mile 156 when she was contacted via radio by Captain James Carlos Clark of the M/V LINDSEY ANN ERICKSON, also travelling southbound approximately 1.4 miles ahead of the M/V HANNAH C. SETTOON. (M/V HANNAH C. SETTOON Daily Boat Logs and Electronic Vessel Logs; U.S. Coast Guard AIS Recordings; M/V HANNAH C. SETTOON Rosepoint Recordings; Demonstrative Video Depictions of Accident; Testimony of Captain Calvin Dean; Testimony of Capt. Pete Dolan; Testimony of Capt. Tim Anselmi).

23. The M/V HANNAH C. SETTOON was headed towards the "Belmont Fairway," a fairway within the river that runs from approximately LMR mile 155 to LMR mile 152. The

Belmont Fairway is approximately 540' wide and designed to permit vessels to transit safely and clear of revetment and fleets located along the west bank of the river. (M/V HANNAH C. SETTOON Daily Boat Logs and Electronic Vessel Logs; U.S. Coast Guard AIS Recordings; M/V HANNAH C. SETTOON Rosepoint Recordings; Demonstrative Video Depictions of Accident; Testimony of Captain Calvin Dean; Testimony of Capt. Pete Dolan; Testimony of Capt. Tim Anselmi).

24. The Mississippi River in the area of the collision was approximately 3000' feet wide. (Captain Tim Anselmi).

25. The Belmont Fairway is a safety channel used in navigation by north and south bound vessels. (Testimony of Captain Calvin Dean; Testimony of Capt. Tim Anselmi).

26. The Belmont Fairway is marked by 3 range lights and day markers positioned on right and left boundary lines and center of the fairway. (Testimony of Captain Calvin Dean; Testimony of Capt. Tim Anselmi).

27. It is customary for southbound vessels such as the M/V HANNAH C. SETTOON to utilize the Belmont Fairway when navigating this section of the Mississippi River when possible because there is a fleet located on the west bank at Mile 152 whose boats tend to use the west bank when travelling northbound. Fleet boats do not typically monitor the tug traffic on VHF radios and expect tugs and larger vessels to keep toward the deep water of the fairway. (Testimony of Captain Calvin Dean; Testimony of Captain Pat Ivey; Testimony of Capt. Tim Anselmi).

28. The M/V LINDSEY ANN ERICKSON had twenty-one (21) grain barges in her tow and intended to maneuver the tow into the AEP Belmont fleet located at approximately LMR Mile

154 on the east bank of the Mississippi River. (Testimony of James Clark; Testimony of Carl Durham; Testimony of Captain Patrick Ivey).

29. This maneuver, referred to as "topping" or "topping around," required the M/V LINDSEY ANN ERICKSON to maneuver her tow from a position facing southbound in the river to a position facing the east bank. (Testimony of James Clark; Testimony of Carl Durham; Testimony of Captain Patrick Ivey).

30. In order to perform this maneuver, the M/V LINDSEY ANN ERICKSON required the assistance of an AEP fleet vessel, the M/V SAFETY GLORY, to push the head of the tow around and, eventually, upriver. (Testimony of James Clark; Testimony of Carl Durham; Testimony of Captain Patrick Ivey).

31. Between 14:58:41 and 14:59:04, the M/V LINDSEY ANN ERICKSON and the M/V HANNAH C. SETTOON entered into a "one whistle" passing agreement whereby the M/V LINDSEY ANN ERICKSON specifically agreed to hold and maintain her position in the river and refrain from her intended "topping" maneuver while the M/V HANNAH C. SETTOON passed to the starboard side of the M/V LINDSEY ANN ERICKSON and her tow.  This would allow for the safe passage of the M/V HANNAH C. SETTOON and her tow, well within the boundaries of the Belmont Fairway. (U.S. Coast Guard AIS Recordings; M/V HANNAH C. SETTOON Rosepoint Recordings; Demonstrative Video Depictions of Accident; Testimony of Captain Calvin Dean; Testimony of Capt. Pete Dolan; Testimony of Capt. Tim Anselmi; Testimony of James Clark).

32. As part of the passing agreement, Captain Clark agreed to "just hold it right here until you get on down and get by before I start topping around." (U.S. Coast Guard AIS Recordings;

Demonstrative Video Depictions of Accident; Testimony of Captain Calvin Dean; Testimony of Capt. Tim Anselmi; Testimony of James Clark).

33. At the time that the passing agreement was established, the M/V LINDSEY ANN ERICKSON and her tow were positioned approximately 300' from the Belmont Fairway's left descending boundary line, or east bank. (M/V HANNAH C. SETTOON Daily Boat Logs and Electronic Vessel Logs; U.S. Coast Guard AIS Recordings; M/V HANNAH C. SETTOON Rosepoint Recordings; Demonstrative Video Depictions of Accident; Testimony of Captain Calvin Dean; Testimony of Capt. Pete Dolan; Testimony of Capt. Tim Anselmi).

34. Initially, per the passing agreement, the M/V LINDSEY ANN ERICKSON, with the assistance of the M/V SAFETY  GLORY,  slowed to almost a complete stop in the middle of the river, near the AEP fleet, and outside of the Belmont Fairway. (M/V HANNAH C. SETTOON Daily Boat Logs and Electronic Vessel Logs; U.S. Coast Guard AIS Recordings; M/V HANNAH C. SETTOON Rosepoint Recordings; Demonstrative Video Depictions of Accident; Testimony of Captain Calvin Dean; Testimony of Capt. Pete Dolan; Testimony of Capt. Tim Anselmi).

35. The M/V LINDSEY ANN ERICKSON was able to maintain her position with no difficulty for approximately four minutes from 15:00 to 15:04. (M/V HANNAH C. SETTOON Daily Boat Logs and Electronic Vessel Logs; U.S. Coast Guard AIS Recordings; M/V HANNAH C. SETTOON Rosepoint Recordings; Demonstrative Video Depictions of Accident; Testimony of Captain Calvin Dean; Testimony of Capt. Pete Dolan; Testimony of Capt. Tim Anselmi; Testimony of James Clark).

36. The M/V HANNAH C. SETTOON, per the passing arrangement, headed for the Belmont Fairway after coming out of her turn at College Point Bend. Captain Dean was navigating

through the well-marked fairway by sight, using the range markers, and was clearly within the boundaries of the fairway well before the M/V HANNAH C. SETTOON's attempted passing of the M/V LINDSAY ANN ERICKSON and subsequent collision. (M/V HANNAH C. SETTOON Daily Boat Logs and Electronic Vessel Logs; U.S. Coast Guard AIS Recordings; M/V HANNAH C. SETTOON Rose Point Recordings; Demonstrative Video Depictions of Accident; Testimony of Captain Calvin Dean; Testimony of Capt. Pete Dolan; Testimony of Capt. Tim Anselmi).

37. Captain Dean placed the M/V HANNAH C. SETTOON on a course that would have passed safely to and well clear of the starboard side of the M/V LINDSEY ANN ERIKSON had the M/V LINDSEY ANN ERIKSON held her position as required by the passing agreement. (U.S. Coast Guard AIS Recordings; M/V HANNAH C. SETTOON Rosepoint Recordings; Demonstrative Video Depictions of Accident; Testimony of Capt. Pete Dolan; Testimony of Capt. Tim Anselmi).

38. At approximately 15:04, the M/V LINDSEY ANN ERICKSON violated the passing agreement when she knowingly began to "top around" before the M/V HANNAH C. SETTOON had safely made its way past the M/V LINDSEY ANN ERICKSON in the river.  This deliberate failure to abide by the passing agreement proximately and solely caused the collision. (M/V HANNAH C. SETTOON Daily Boat Logs and Electronic Vessel Logs; U.S. Coast Guard AIS Recordings; M/V HANNAH C. SETTOON Rosepoint Recordings; Demonstrative Video Depictions of Accident; Testimony of Captain Calvin Dean; Testimony of Capt. Pete Dolan; Testimony of Capt. Tim Anselmi; Testimony of James Clark).

39. The "top around" caused the stern of the M/V LINDSEY ANN ERICKSON to move toward the right descending (west) bank of the Mississippi River, into the Belmont Fairway, and

into the portside of the E2MS-303 barge path of the M/V HANNAH C. SETTOON causing the oil spill at issue. (U.S. Coast Guard AIS Recordings; M/V HANNAH C. SETTOON Rosepoint Recordings; Demonstrative Video Depictions of Accident; Testimony of Captain Calvin Dean; Testimony of Capt. Pete Dolan; Testimony of Capt. Tim Anselmi).

40.  From the time the passing agreement was made until the time of the collision, the M/V LINDSEY ANN ERICKSON moved toward the right descending (west) bank, approximately 425' into the Belmont Fairway and the intended path of the M/V HANNAH C. SETTOON and her tow. (U.S. Coast Guard AIS Recordings; M/V HANNAH C. SETTOON Rosepoint Recordings; Demonstrative Video Depictions of Accident; Testimony of Captain Calvin Dean; Testimony of Capt. Pete Dolan; Testimony of Capt. Tim Anselmi).

41.  The M/V LINDSEY ANN ERICKSON moved at an average rate of approximately 42 feet per minute from 14:58:06 to 15:09:02. (U.S. Coast Guard AIS Recordings; M/V HANNAH C. SETTOON Rosepoint Recordings; Demonstrative Video Depictions of Accident; Testimony of Capt. Pete Dolan; Testimony of Capt. Tim Anselmi).

42.  The M/V LINDSEY ANN ERICKSON's rate of speed continuously increased until she was moving at a rate of 172 feet per minute between 15:09:02 and 15:09:20. (M/V HANNAH C. SETTOON Daily Boat Logs and Electronic Vessel Logs; U.S. Coast Guard AIS Recordings; M/V HANNAH C. SETTOON Rosepoint Recordings; Demonstrative Video Depictions of Accident; Testimony of Capt. Pete Dolan; Testimony of Capt. Tim Anselmi).

43.  The M/V LINDSEY ANN ERICKSON was increasing in speed towards the right descending (west) bank just prior to the time of the collision and had travelled approximately 60' in the 18 seconds just prior to the collision. (U.S. Coast Guard AIS Recordings; M/V HANNAH

C. SETTOON Rosepoint Recordings; Demonstrative Video Depictions of Accident; Testimony of Captain Calvin Dean; Testimony of Capt. Pete Dolan; Testimony of Capt. Tim Anselmi).

44. In fact, despite calling out a warning over the VHF radio and attempting to steer out of the way, Captain Dean and tankerman Savona witnessed the wheelwash of the M/V LINDSAY ANN ERIKSON as she continued to reverse in their direction.  (Testimony of Captain Calvin Dean; Testimony of Kip Savona).

45. The movement of the M/V LINDSEY ANN ERICKSON toward the right descending (west) bank was a not result of the vessel drifting with the river's current, but instead was the direct and intended result of Captain Clark's placing the vessel in reverse while ordering the AEP M/V SAFETY GLORY TO push on the end of her tow in order to "top around." (Testimony of James Clark; Testimony of Carl Durham; Testimony of Captain Patrick Ivey).

46. The M/V LINDSEY ANN ERICKSON moved directly into the path of the M/V HANNAH C. SETTOON and literally backed into the E2MS-303 despite clear visibility that day and the fact that the approaching M/V HANNAH C. SETTOON would have been readily visible from the wheelhouse of the M/V LINDSEY ANN ERICKSON. (U.S. Coast Guard AIS Recordings; M/V HANNAH C. SETTOON Rosepoint Recordings; Demonstrative Video Depictions of Accident; Testimony of Captain Calvin Dean; Testimony of Capt. Pete Dolan; Testimony of Capt. Tim Anselmi; Testimony of James Clark; Testimony of Carl Durham; Testimony of Captain Patrick Ivey).

47. The failure of the M/V LINDSEY ANN ERICKSON to maintain her course and speed as per the passing agreement was a violation of U.S. Coast Guard Inland Navigation Rule No. 17 which requires a vessel who is to keep out of the way to maintain her course and speed. (Testimony of Captain Tim Anselmi).

48. Captain Clark of the M/V LINDSEY ANN ERICKSON was disciplined by the U.S. Coast Guard for violating U.S. Coast Guard Inland Navigation Rule No. 17 for failing to maintain his course and speed. (U.S. Coast Guard Enforcement Action against James Clark, Pilot of the M/V LINDSEY ANN ERICKSON).

49. In response to the actions of the M/V LINDSEY ANN ERIKSON, the M/V HANNAH C. SETTOON hailed her on the radio and altered her course more dramatically to starboard in order to avoid the collision. (U.S. Coast Guard AIS Recordings; M/V HANNAH C. SETTOON Rosepoint Recordings; Demonstrative Video Depictions of Accident; Testimony of Captain Calvin Dean; Testimony of Capt. Pete Dolan; Testimony of Capt. Tim Anselmi).

50. The alteration of her course to starboard was the most extreme evasive maneuver available to the M/V HANNAH C. SETTOON considering the current in the Mississippi River as well as the M/V HANNAH C. SETTOON's position in the Mississippi River. (U.S. Coast Guard AIS Recordings; M/V HANNAH C. SETTOON Rosepoint Recordings; Demonstrative Video Depictions of Accident; Testimony of Captain Calvin Dean; Testimony of Capt. Tim Anselmi).

51. The M/V HANNAH C. SETTOON altered its course 24.2° to starboard, away from the M/V LINDSEY ANN ERIKSON and toward the right descending (west) bank of the Mississippi River from 15:05:08 to 15:10:08. (U.S. Coast Guard AIS Recordings; M/V HANNAH C. SETTOON Rosepoint Recordings; Demonstrative Video Depictions of Accident; Testimony of Capt. Pete Dolan; Testimony of Capt. Tim Anselmi).

52. The M/ V HANNAH C. SETTOON was operating at a speed of approximately 9.5 knots at the time of and the minutes leading up to the collision. (Testimony of Captain Pete Dolan).

53. 9.5 knots was an appropriate speed under the circumstances. (Testimony of Captain Calvin Dean; Testimony of Captain Tim Anselmi).

54. Despite all efforts of the M/V HANNAH C. SETTOON, it was impossible to avoid the collision and the M/V LINDSEY ANN ERICKSON backed into the port side of the E2MS-303 barge.  (U.S. Coast Guard AIS Recordings; M/V HANNAH C. SETTOON Rosepoint Recordings; Demonstrative Video Depictions of Accident; Testimony of Captain Calvin Dean; Testimony of Capt. Pete Dolan; Testimony of Capt. Tim Anselmi).

55. It was the starboard stern corner of the M/V LINDSEY ANN ERIKSON which punctured the portside of the E2MS-303 at 15:09:40. (Photos of Barge E2MS-303; Photos of M/V LINDSEY ANN ERICKSON; Captain Pete Dolan; Testimony of Captain Calvin Dean).

56. The puncture of the *side* of the E2MS-303, as opposed to the bow (or front) of the E2MS-303, shows that the M/V LINDSEY ANN ERICKSON hit the E2MS-303; the E2MS-303 did not strike the M/V LINDSEY ANN ERICKSON. In fact, the bow of the E2MS-303 had already cleared the stern of the M/V LINDSEY ANN ERICKSON at the time of the collision. (Photos of Barge E2MS-303; Photos of M/V LINDSEY ANN ERICKSON; Captain Pete Dolan; Testimony of Captain Calvin Dean).

57. The M/V LINDSEY ANN ERICKSON's path of travel was nearly perpendicular to the path of travel of the M/V HANNAH C. SETTOON at the time of and the minutes leading up to the collision. (U.S. Coast Guard AIS Recordings; M/V HANNAH C. SETTOON Rosepoint Recordings; Demonstrative Video Depictions of Accident; Testimony of Capt. Pete Dolan; Testimony of Capt. Tim Anselmi).

58. Accordingly, a crossing situation existed at the time of the collision. (U.S. Coast Guard AIS Recordings; M/V HANNAH C. SETTOON Rosepoint Recordings; Demonstrative Video Depictions of Accident; Testimony of Capt. Pete Dolan; Testimony of Capt. Tim Anselmi).

59. The Parties were entitled to rely upon the passing agreement between them, and had affirmative obligations to uphold it. (U.S. Coast Guard AIS Recordings; M/V HANNAH C. SETTOON Rosepoint Recordings; Demonstrative Video Depictions of Accident; Testimony of Capt. Pete Dolan; Testimony of Capt. Tim Anselmi).

60. Had the M/V LINDSEY ANN ERICKSON held her position in the river per the Parties' passing agreement, the M/V HANNAH C. SETTOON would have had sufficient room to pass "on the one whistle," or to starboard, without risk of collision and without the risk associated with hugging the west bank of the river, where heavy fleeting traffic at the bend presents a danger to any vessel entering that next southbound turn. (U.S. Coast Guard AIS Recordings; M/V HANNAH C. SETTOON Rosepoint Recordings; Demonstrative Video Depictions of Accident; Testimony of Capt. Pete Dolan; Testimony of Capt. Tim Anselmi).

61. The M/V LINDSEY ANN ERICKSON began topping around despite their awareness that the M/V HANNAH C. SETTOON had not yet safely passed. (U.S. Coast Guard AIS Recordings; M/V HANNAH C. SETTOON Rosepoint Recordings; Demonstrative Video Depictions of Accident; Testimony of James Clark; Testimony of Carl Durham; Testimony of Captain Patrick Ivey).

62. The failure of Marquette and/or the M/V LINDSEY ANN ERICKSON to abide by the terms of the passing agreement solely and proximately caused the collision, and created an *in extremis* situation entitling Settoon to exoneration from and/or reduced liability for any negligence or violation. (Testimony of Captain Tim Anselmi).

63. Captain Clark did not practice prudent seamanship when he began "topping around" before the M/V HANNAH C. SETTOON completed her passing maneuver in violation of the passing agreement. (Testimony of Captain Tim Anselmi).

64. The M/V LINDSEY ANN ERICKSON was equipped with an AIS unit and radar, both of which would have shown the location of the M/V HANNAH C. SETTOON had Captain Clark monitored these navigational aids. (Testimony of James Clark; Testimony of Carl Durham; Testimony of Captain Calvin Dean; Testimony of Captain Tim Anselmi).

65. Captain Clark clearly failed to monitor the AIS unit and radar, which would have shown him the M/V HANNAH C. SETTOON's position in the river and that an accident was imminent if he continued topping around.  (Testimony of James Clark; Testimony of Carl Durham; Testimony of Captain Tim Anselmi).

66. Captain Clark failed to post a lookout at the time of the collision, who would have told him the M/V HANNAH C. SETTOON's position in the river and that an accident was imminent if he continued topping around.  (Testimony of James Clark; Testimony of Carl Durham).

67. Had a lookout been posted in the wheelhouse or on the stern of the M/V LINDSEY ANN ERICKSON, Captain Clark would have known that the M/V HANNAH C. SETTOON had not passed the M/V LINDSEY ANN ERICKSON and would not have initiated, or at the very least, stopped the "top around." (Testimony of James Clark; Testimony of Carl Durham; Testimony of Captain Tim Anselmi).

68. A properly posted lookout would have easily been able to see the location of the M/V HANNAH C. SETTOON and that the M/V LINDSEY ANN ERICKSON "top around" was impeding the M/V HANNAH C. SETTOON's intended path of travel. (Testimony of James Clark; Testimony of Carl Durham; Testimony of Captain Tim Anselmi).

69. Alternatively, Captain Clark did not advise his lookout of the passing agreement and/or the need to keep a lookout to the stern of the vessel for the passing M/V HANNAH C. SETTOON. (Testimony of James Clark; Testimony of Carl Durham).

70. The only other crew member in the wheelhouse at the time of the collision was Carl Durham who was not acting as a lookout and/or did not properly perform his function as a lookout. (Testimony of James Clark; Testimony of Carl Durham).

71. Durham did not see the M/V HANNAH C. SETTOON until after contact was made by the M/V LINDSEY ANN ERICKSON. (Testimony of Carl Durham).

72. Had Durham been looking out of the rear window of the M/V LINDSEY ANN ERICKSON, he would have seen the M/V HANNAH C. SETTOON well in advance of the collision and warned Captain Clark of the risk of collision. (Testimony of James Clark; Testimony of Carl Durham; Testimony of Captain Tim Anselmi).

73. Had Durham been posted as a lookout to monitor the M/V HANNAH . SETTOON, he could have advised his captain of the risk of collision in "topping around."  (Testimony of James Clark; Testimony of Carl Durham; Testimony of Captain Tim Anselmi).

74. Captain Clark's failure to post a proper lookout was a violation of U.S. Coast Guard Inland Navigation Rule No. 5 which requires a vessel to "at all times maintain a proper look-out … so as to make a full appraisal of the situation and the risk of collision." (Testimony of Captain Tim Anselmi).

75. Captain Clark's failure to utilize the AIS unit, radar, or a lookout to continuously monitor the location of the M/V HANNAH C. SETTOON was a negligent violation of U.S. Coast Guard Inland Navigation Rule No. 7 which requires a vessel to "use all available means appropriate to the prevailing circumstances and conditions to determine if risk of collision

{N3133381.1}
16

exists," and was the sole and proximate cause of the collision. (Testimony of Captain Tim Anselmi).

76. Captain Clark's failure to wait until the M/V HANNAH C. SETTOON completed her passing maneuver to begin "topping around," failure to sound a general alarm, and failure to take any immediate corrective actions to avoid the collision, and instead increasing his speed on a path directly intersecting the path of the M/V HANNAH C. SETTOON, were negligent violations of U.S. Coast Guard Inland Navigation Rule No. 8 which provides, in pertinent part, that "a vessel which, by any of these rules, is required not to impede the passage or safe passage of another vessel shall, when required by the circumstances of the case, take early action to allow sufficient sea room for the safe passage of the other vessel." (Testimony of Captain Tim Anselmi).

77. Captain Dean's communication to Captain Clark at approximately 15:07:  "[a]ppreciate your patience there LINDSEY ANN, ya'll have a good evening.  The HANNAH," did not communicate to the M/V LINDSEY ANN ERICKSON that the M/V HANNAH C. SETTOON had completed her passing maneuver nor did it release the M/V LINDSEY ANN ERICKSON from the passing agreement. (Testimony of Captain Calvin Dean; Testimony of Captain Tim Anselmi).

78. It is not customary practice in the industry to indicate the completion of a passing maneuver through a communication of simple greeting to have a good evening.  (Testimony of Captain Calvin Dean; Testimony of Captain Tim Anselmi).

79. Captain Dean never released the M/V LINDSEY ANN ERICKSON from the passing agreement nor acknowledged that the M/V LINDSEY ANN ERICKSON could begin "topping around." (Testimony of Captain Calvin Dean; Testimony of Captain Tim Anselmi).

80.  The stern of the M/V LINDSEY ANN ERICKSON collided with the portside of the E2MS-303 resulting in a gash in the portside of the E2MS-303 and a spill of approximately 750 barrels of light crude oil into the Mississippi River. (Photos of Barge E2MS-303; Photos of M/V LINDSEY ANN ERICKSON; Captain Pete Dolan; Testimony of Captain Calvin Dean).

81.  As a result of the incident, approximately 70 miles of the Mississippi River was shut down for all traffic until February 24, around 1:30 p.m., just less than 48 hours post-incident. (U.S. Coast Guard Timeline of Navigation Restrictions).

82.  The Captain and/or crew of the M/V LINDSEY ANN ERICKSON were not sufficiently trained and/or experienced. (Personnel files, limited to training and licensing information, of the crew of the M/V LINDSEY ANN ERICKSON; Safety Meeting Minutes for M/V LINDSEY ANN ERICKSON; Various Marquette Manuals, Policies, and Handbooks regarding safety and training).

## PROPOSED CONCLUSIONS OF LAW

1.  The Court has jurisdiction over the parties under 28 U.S.C. § 1333; the Shipowners' exoneration and Limitation of Liability Act of Title 46 of the United States Code, Sections 30501, *et seq.*; 33 U.S.C. § 2701, *et seq.*, the Oil Pollution Act of 1990;  Rule 9(h) of the Federal Rules of Civil Procedure; and Rule F of the Supplemental Rules for Certain Admiralty & Maritime Claims.

2.  The Court has personal jurisdiction over all of the parties to this action.

## I.    NEGLIGENCE AND UNSEAWORTHINESS

3.  "To establish maritime negligence, a plaintiff must 'demonstrate that there was a duty owed by the defendant to the plaintiff, breach of that duty, injury sustained by [the] plaintiff, and a causal connection between the defendant's conduct and the plaintiffs injury.'" *Canal Barge*

*Co., Inc. v. Torco Oil Co.*, 220 F.3d 370, 376 (5th Cir. 2000) (alteration in original) (quoting *In re Cooper/T. Smith*, 929 F.3d 1073, 1077 (5th Cir. 1991).

4. "[U]nder the maritime law of general negligence, each party [has] a duty to exercise reasonable care as required by standards of prudent seamanship." *Tokio Marine and Fire Ins. Co., Ltd. v. M/V Flora,* NO. 97-1154, 1999 WL 14000, at *12 (E.D. La. Jan. 11, 1999) (Duval, J.); *see also Id.*, at * 11  ("In determining whether a party has been negligent, the court determines whether, when judged against the standard of good and prudent seamanship, the collision could have been prevented by the exercise of due care.").  "A finding of negligence need not be premised on the violation of a specific statute or regulation." *Theriot v. United States,* 245 F.3d 388, 402 (5th Cir. 1998).

5. The causation element of maritime negligence includes both cause in fact and legal cause. *In re Mid-South Towing Co.,* 418 F.3d 526, 532 (5th Cir. 2005).  Cause in fact is satisfied where the injury would not have occurred but for the defendant's negligent act or omission.  However, a party's negligence is actionable under general maritime law only if it is a "legal cause" of the plaintiff s injuries.  *See Donaghey v. Ocean Drilling & Exploration Co.*, 974 F.2d 646, 648 (5th Cir. 1992); *Chavez v. Noble Drilling Corp.*, 567 F.2d 287, 289 (5th Cir. 1978); "Legal cause is something more than 'but for' causation." *Donaghey,* 974 F.2d at 648 (citations omitted) (quoting Thomas *v. Express Boat Co., Inc.*, 759 F.2d 444, 448 (5th Cir. 1985)).  "To give rise to liability, a culpable act or omission must have been 'a substantial and material factor in causing the collision.'" *Am. River Trans. Co. v. Kava Kaliakra SS*, 148 F.3d 446, 450 (5th Cir. 1998) (quoting *Inter-Cities Navig. Corp. v. United States*, 608 F.2d 1079, 1081 (5th Cir. 1979)); *see also Chavez*, 567 F.2d at 289 (defining "substantial factor" as "more than but for the negligence, the harm would not have resulted").  Maritime law allows proof of causation through inferences

that arise from circumstantial evidence. *See Marathon Pipe Line Co. v. Drilling Rig Rowan/Odessa*, 527 F. Supp. 824, 831 (E.D. La. 1981).

6.  Marquette is vicariously liable for the negligent actions of its Captain and/or crew.

7.  The Court finds as a matter of law that Captain Clark was negligent in "topping around" before the M/V HANNAH C. SETTOON had passed the M/V LINDSEY ANN ERICKSON and in violation of the passing agreement between the M/V HANNAH C. SETTOON and the M/V LINDSEY ANN ERICKSON.

8.  The Court finds as a matter of law that Captain Clark was negligent in failing to maintain the M/V LINDSEY ANN ERICKSON's course and speed as required by the passing agreement.

9.  The Court finds as a matter of law that Captain Clark was negligent in knowingly moving into the path of the M/V HANNAH C. SETTOON before she completed her passing maneuver.

10.  The Court finds as a matter of law that Captain Clark was negligent in failing to utilize available AIS and radar data to monitor the location of the M/V HANNAH C. SETTOON in relation to the location of the M/V LINDSEY ANN ERICKSON.

11.  The Court finds as a matter of law that Captain Clark was negligent in failing to maintain a proper lookout.

12.  The Court finds as a matter of law that Captain Clark was negligent in failing to take immediate evasive actions upon discovering the risk of collision.

13.  The Court finds as a matter of law that Marquette was negligent in failing to properly train the crew of the M/V LINDSEY ANN ERICKSON.

14.  The Court finds as a matter of law that Marquette was negligent in crewing the M/V LINDSEY ANN ERICKSON with an inexperienced crew and/or captain.

15. The Court finds as a matter of law that Marquette was negligent for not enforcing their safety policies and operations procedures which would have avoided this accident.

16. The Court finds as a matter of law that Marquette was negligent for failing to ensure that its captain abided by the Inland Navigation Rules or "Rules of the Road."

17. An unseaworthy vessel is one that is not fit for its intended use. *Gutierrez v. Waterman, S.S. Co.,* 373 U.S. 206 (1963).

18. Providing an inadequately trained crew and/or failing to properly train and/or supervise employees constitutes unseaworthiness. *See Comeaux v. T.L. James & Co., Inc.,* 702 F.2d 1023 (5th Cir. 1983); *Nichols v. Weeks Marine, Inc.,* 513 F.Supp.2d 627 (E.D. La. 207); *Brown v. Cliff's Drilling Co.,* 638 F.Supp. 1009 (E.D. Tex. 1986).

19. The Court finds as a matter of law that the M/V LINDSEY ANN ERICKSON was unseaworthy at the time of the collision as a result of Marquette's failure to provide its crew with adequate training and/or supervision and failure to crew the vessel with an experienced captain and crew.

20. The Court finds as a matter of law that the M/V HANNAH C. SETTOON was seaworthy and fit for her intended use at the time of the collision.

21. The doctrine of *in extremis* has long been a part of admiralty law. In *The Blue Jacket*, the United States Supreme Court stated that "where one ship has, by wrong maneuvers, placed another ship in a position of extreme danger, that other ship will not be held to blame if she has done something wrong, and has not been maneuvered with perfect skill and presence of mind." 144 U.S. 371, 392 (1892). The Court has further stated that "the judgment of a competent sailor *in extremis* cannot be impugned." *The Oregon*, 158 U.S. 186, 204 (1895). What constitutes an

error in extremis or an in extremis situation depends on the imminence of the danger and each case must be determined on its own facts. *The Mary P. Mosquito*, 145 F. 960 (E.D. Va. 1906).

22. The Court finds as a matter of law that the actions of the M/V LINDSEY ANN ERICKSON in "topping around" before the M/V HANNAH C. SETTOON had passed the M/V LINDSEY ANN ERICKSON and in violation of the passing agreement between the M/V HANNAH C. SETTOON and the M/V LINDSEY ANN ERICKSON created an *in extremis* situation.

23. The Court finds as a matter of law that Settoon is not liable as a result of its maneuvering and/or the decisions of Captain Dean because an *in extremis* situation existed solely as a result of the actions of the M/V LINDSEY ANN ERICKSON.

24. The Court finds as a matter of law that the negligence of Captain Clark, the crew of the M/V LINDSEY ANN ERICKSON, and/or Marquette was the sole and proximate cause of the collision.

25. The Court finds as a matter of law that actions of Settoon, Captain Dean, and the crew of the M/V HANNAH C. SETTOON were at all times reasonable under the circumstances, prudent, and free from fault.

## II.   *PENNSYLVANIA* RULE PRESUMPTION OF FAULT

26. Collision law recognizes a number of presumptions directed to the issue of causation. One of the most important of these presumptions is the *Pennsylvania* Rule, which is applied when a vessel violates a navigational statute or regulation, and a collision results; the presumption of fault shifts to the violator.  *The Pennsylvania v. Troop*, 86 U.S. (19 Wall.) at 136.; *United States v. Nassau Marine Corp.*, 778 F.2d 1111 (5th Cir. 1985).   Under the *Pennsylvania* Rule, when a vessel involved in an accident is shown to have breached a statute or

regulation, it must show not only that its breach was not a contributory cause of the accident but that it "could not have been" a proximate cause of the collision. *The Pennsylvania v. Troop*, 86 U.S. (19 Wall.) at 125, 22 Lawyers' Edition 148, 151 (1873); *Trinidad Corporation v. The S.S. Keiyo Maru*, 845 F.2d 818 (9th Cir. 1988); *In the Matter of T.T. Boat Corporation*, 1999 AMC 2776 (E.D.La. 1999). In effect, the burden of proof as to the causation issue is shifted once it is established that the vessel violated the statute or regulation. *Garner v. Cities Serv. Tankers Corp.,* 456 F.2d 476, 478 (5th Cir. 1972). The *Pennsylvania* Rule applies wherever a statute or regulation that is "intended to prevent collisions" is violated. *The Pennsylvania*, 86 U.S. at 136.

27. The *Pennsylvania* rule shifts the burden of proof as to causation to the statutory offender, but does not by itself impose liability. *Bd. of Comm. of the Port of New Orleans v. the M/V FARMSUM*, 574 F.2d 289, 297-298 (5th Cir. 1978); *Dahlia Maritime Co., Ltd. v. M/S NORDIC CHALLENGER*, 1993 U.S. Dist. Lexis, 10170, p. 7 (E.D. La. 1994). In other words, if one party carries its burden under the Pennsylvania rule, the burden of proof as to causation is then shifted to its opponent; however, the shifted burden does not ipso facto impose liability. *Williamson Leasing Co., Inc., v. American Commercial Lines, Inc.*, 616 F.Supp. 1330, 1339 (E.D. La. 1985); *Otto Candies, Inc. v. M/V MADELINE*, 721 F.2d 1034, 1036 (5th Cir. 1983).

28. The Court finds as a matter of law that Marquette committed numerous statutory and regulatory violations, triggering the application of the Pennsylvania Rule.

## III.   STATUTORY AND REGULATORY VIOLATIONS

29. Because this incident occurred in the inner coastal waters of the State of Louisiana, the INLAND navigational rules set forth in 33 U.S.C. §§ 2001-2038 ( otherwise known as the "Inland Rules") are applicable and control the navigational conduct of the M/V HANNAH C. SETTOON and the M/V LINDSAY ANN ERIKSON.

30.  When a vessel violates one of the Inland Rules, this is a statutory violation invoking the *Pennsylvania* Rule which imposes upon the violator the burden of prove that its violation could not have in any way caused the collision.  *See Johnson v. the United States*, 4 F.2d 102, 103 (5th Cir. 1925).

31.  Rule 13 of the U.S. Coast Guard Inland Navigation Rules provides that:

> (a) Overtaking vessel to keep out of the overtaken vessel's way. Notwithstanding anything contained in Rules 4 through 18, any vessel overtaking any other shall keep out of the way of the vessel being overtaken.

> (b) Overtaking vessel defined. A vessel shall be deemed to be overtaking when coming up with another vessel from a direction more than 22.5 degrees abaft her beam; that is, in such a position with reference to the vessel she is overtaking, that at night she would be able to see only the sternlight of that vessel but neither of her sidelights.

> (c) Assumption that vessel is overtaking another in cases of doubt. When a vessel is in any doubt as to whether she is overtaking another, she shall assume that this is the case and act accordingly.

32. The Court finds as a matter of law that the maneuvers of the M/V LINDSEY ANN ERICKSON which placed her perpendicular to the path of travel of the M/V HANNAH C. SETTOON created a crossing situation and, therefore, Rule 13 does not apply.

33. Alternatively, navigational obligations agreed to by the M/V LINDSEY ANN ERICKSON and the M/V HANNAH C. SETTOON in the passing agreement superseded the navigational obligations of Rule 13.  "A vessel is entitled to rely on the announced intention of another vessel in regard to a passing, and on the presumption that the other vessel will govern herself accordingly." *Tokio Marine and Fire Ins. Co., Ltd. v. M/V Flora*, 1999 WL 14000, *11 (E.D.La. 1999).

34. The Court finds as a matter of law that the M/V LINDSEY ANN ERICKSON was required by the passing agreement to maintain her position until the M/V HANNAH C. SETTOON had passed, thus making the M/V LINDSEY ANN ERICKSON the burdened vessel.

35. The Court finds as a matter of law that the M/V LINDSEY ANN ERICKSON violated the passing agreement when she began "topping around" before the M/V HANNAH C. SETTOON had either passed her or released her from the passing agreement.

36. The Court finds as a matter of law that the M/V HANNAH C. SETTOON did not violate the passing agreement or Rule 17 of the U.S. Coast Guard Inland Navigation Rules because as the "stand-on" vessel she maintained her course and speed throughout the passing maneuver and only changed her course to avoid the collision by attempting to steer to starboard and our of the way of the reversing M/V LINDSEY ANN ERICKSON.

37. The Court finds as a matter of law that the communication of the M/V HANNAH C. SETTOON: "[A]ppreciate your patience there LINDSEY ANN, ya'll have a good evening. The HANNAH" did not communicate to the M/V LINDSEY ANN ERICKSON that the M/V HANNAH C. SETTOON had completed her passing maneuver nor did it release the M/V LINDSEY ANN ERICKSON from the passing agreement.

38. The Court finds as a matter of law that the M/V LINDSEY ANN ERICKSON had an obligation to maintain her course and speed throughout the passing maneuver of the M/V HANNAH C. SETTOON.

39. Rule 17 of the U.S. Coast Guard Inland Navigation Rules provides that:

> (a) Stand-on vessel to keep course and speed; action allowed when give-way vessel fails to take appropriate action.
>
> > (1) Where one of two vessels is to keep out of the way, the other shall keep her course and speed.

(2) The latter vessel may, however, take action to avoid collision by her maneuver alone, as soon as it becomes apparent to her that the vessel required to keep out of the way is not taking appropriate action in compliance with these Rules.

(b) Action by stand-on vessel allowed when action by give-way vessel alone cannot avoid collision. When, from any cause, the vessel required to keep her course and speed finds herself so close that collision cannot be avoided by the action of the give-way vessel alone, she shall take such action as will best aid to avoid collision.

(c) Crossing situations. A power-driven vessel which takes action in a crossing situation in accordance with subparagraph (a)(2) of this Rule to avoid collision with another power-driven vessel shall, if the circumstances of the case admit, not alter course to port for a vessel on her own port side.

(d) Give-way vessel not relieved of obligation to keep out of the way. This Rule does not relieve the give-way vessel of her obligation to keep out of the way.

40.  The Court finds as a matter of law that the M/V LINDSEY ANN ERICKSON violated Rule 17(a)(1) requiring her to maintain her course and speed when she began "topping around" before the M/V HANNAH C. SETTOON had either released passed her or released her from the passing agreement.

41.  The Court further finds as a matter of law that the M/V LINDSEY ANN ERICKSON violated Rule 17(b) requiring her to take action to avoid a collision when she failed to take any evasive action and was actually increasing speed in reverse in the direction of the M/V HANNAH C. SETTOON just prior to the collision.

42. Rule 16 of the U.S. Coast Guard Inland Navigation Rules provides that:

Every vessel which is directed to keep out of the way of another vessel shall, so far as possible, take early and substantial action to keep well clear.

43. The Court further finds as a matter of law that the M/V HANNAH C. SETTOON, if she was the "give-way" vessel, did not violate Rule 16 of the U.S. Coast Guard Inland Navigation Rules.

44. The Court finds as a matter of law that the M/V HANNAH C. SETTOON took early and substantial action to keep well clear of the M/V LINDSEY ANN ERICKSON because the M/V HANNAH C. SETTOON's intended route would have provided for more than 300' of clearance had the M/V LINDSEY ANN ERICKSON maintained her course and speed and because the M/V HANNAH C. SETTOON began steering to starboard in an attempt to increase the distance between the M/V HANNAH C. SETTOON and the M/V LINDSEY ANN ERICKSON as soon as she became aware of the risk of a collision.

45. The Court finds as a matter of law that the orientation of the M/V LINDSEY ANN ERICKSON perpendicular to the path of the M/V HANNAH C. SETTOON at the time of and in the minutes leading up to the collision created a crossing situation pursuant to Rule 15 of the U.S. Coast Guard Inland Navigation Rules.   Where two vessels are approaching one another from a 90 degree angle in a waterway, "the respective headings of the boats might more properly indicate a 'crossing' in which the vessel that has one on its starboard side is required to give way to the other." *Guilbeau v. Calzada*, 240 So.2d 104, 108 (La.App. 4 Cir. 1970); *see also Rodriguez v. Walters*, 2012-CA-0959; 2014 WL 535724, at *16 (La.App. 4 Cir. 2014)(Judge Jenkins, dissenting).

46. Rule 15 of the U.S. Coast Guard Inland Navigation Rules provides that:

> (a) Vessel which must keep out of the other vessel's way. When two power-driven vessels are crossing so as to involve risk of collision, the vessel which has the other on her starboard side shall keep out of the way and shall, if the circumstances of the case admit, avoid crossing ahead of the other vessel.

> (b) Vessels crossing river. Notwithstanding paragraph (a), on the Great Lakes, Western Rivers, or water specified by the Secretary, a power-driven vessel crossing a river shall keep out of the way of a power-driven vessel ascending or descending the river.

47. The Court finds as a matter of law that, because the M/V LINDSEY ANN ERICKSON was operating in reverse at the time of the collision, her port side functioned as her starboard side for the purposes of Rule 15.

48. The Court finds as a matter of law that the M/V LINDSEY ANN ERICKSON was the "give-way" vessel in the crossing situation between the M/V LINDSEY ANN ERICKSON and the M/V HANNAH C. SETTOON because the M/V HANNAH C. SETTOON was on the M/V LINDSEY ANN ERICKSON's starboard side.

49. The Court finds as a matter of law that the M/V LINDSEY ANN ERICKSON violated Rule 15 by failing to keep out of the way of the M/V HANNAH C. SETTOON and failing to avoid crossing ahead of the M/V HANNAH C. SETTOON when the M/V LINDSEY ANN ERICKSON began "topping around" before the M/V HANNAH C. SETTOON had either released passed her or released her from the passing agreement.

50. The Court finds as a matter of law that the M/V LINDSEY ANN ERICKSON did not maintain a lookout at all and/or did not maintain a proper lookout at the time of the collision.

51. Rule 5 of the U.S. Coast Guard Inland Navigation Rules provides that:

> Every Vessel shall at all times maintain a proper look-out by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and the risk of collision.

52. The Court finds as a matter of law that the M/V LINDSEY ANN ERICKSON violated Rule 5 by failing to maintain a proper lookout since no lookout was posted in the wheelhouse of the M/V LINDSEY ANN ERICKSON to ensure that there was no risk of collision with the M/V HANNAH C. SETTOON.

{N3133381.1}

53. The Court determines as a matter of law that the M/V LINDSEY ANN ERICKSON failed to use available AIS units, radar, and lookouts to determine if a risk of collision with the M/V HANNAH C. SETTOON existed.

54. Rule 7 of the U.S. Coast Guard Inland Navigation Rules provides that:

> (a)   Determination if risk exists.   Every Vessel shall use all available means appropriate to the prevailing circumstances and conditions to determine if risk of collision exists.   If there is any doubt such risk shall be deemed to exist.

55. The Court finds as a matter of law that M/V LINDSEY ANN ERICKSON failure to use available AIS units, radar, and lookouts to determine if a risk of collision with the M/V HANNAH C. SETTOON existed was a violation of Rule 7.

56. The Court finds as a matter of law that the M/V LINDSEY ANN ERICKSON failed to take evasive actions to avoid the risk of collision and was, in fact, increasing speed in a course that directly intercepted the path of the M/V HANNAH C. SETTOON.

57. Rule 8 of the U.S. Coast Guard Inland Navigation Rules provides that:

> (a) General characteristics of action taken to avoid collision. Any action taken to avoid collision shall, if the circumstances of the case admit, be positive, made in ample time and with due regard to the observance of good seamanship.

> (b) Readily apparent alterations in course or speed. Any alteration of course or speed to avoid collision shall, if the circumstances of the case admit, be large enough to be readily apparent to another vessel observing visually or by radar; a succession of small alterations of course or speed should be avoided.

> (c) Alteration of course to avoid close-quarters situation. If there is sufficient sea room, alteration of course alone may be the most effective action to avoid a close-quarters situation provided that it is made in good time, is substantial and does not result in another close-quarters situation.

> (d) Action to result in passing at safe distance. Action taken to avoid collision with another vessel shall be such as to result in

passing at a safe distance. The effectiveness of the action shall be carefully checked until the other vessel is finally past and clear.

(e) Slackening of vessel speed; stopping or reversing means of propulsion. If necessary to avoid collision or allow more time to assess the situation, a vessel shall slacken her speed or take all way off by stopping or reversing her means of propulsion.

(f) Early action to allow room for safe passage:

> (1) A vessel which, by any of these Rules, is required not to impede the passage or safe passage of another vessel shall, when required by the circumstances of the case, take early action to allow sufficient sea room for the safe passage of the other vessel.

> (2) A vessel required not to impede the passage or safe passage of another vessel is not relieved of this obligation if approaching the other vessel so as to involve risk of collision and shall, when taking action, have full regard to the action which may be required by the Rules of this part.

> (3) A vessel the passage of which is not to be impeded remains fully obliged to comply with the Rules of this part when the two vessels are approaching one another so as to involve risk of collision.

58. The Court finds as a matter of law that the M/V LINDSEY ANN ERICKSON actions in failing to take evasive actions to avoid the risk of collision and, in fact, increasing speed in a course that directly intercepted the path of the M/V HANNAH C. SETTOON was a violation of Rule 8.

59. The Court finds as a matter of law that the M/V LINDSEY ANN ERICKSON violated U.S. Coast Guard Inland Navigation Rules No. 5, 7, 8, 15, 16, and 17.   Under *The PENNSYLVANIA*, 86 U.S. (19 Wall) 125 (1873) and its progeny, violation of these safety rules places the burden on Marquette to show not only that the violations did not but could not have contributed to the collision.  The Court finds as a matter of law that Marquette has failed to meet this burden.

60. Rule 6 of the U.S. Coast Guard Inland Navigation Rules provides that:

> Every vessel shall at all times proceed at a safe speed so that she can take proper and effective action to avoid collision and be stopped within a distance appropriate to the prevailing circumstances and conditions. In determining a safe speed the following factors shall be among those taken into account:
>
> (a) By all vessels:
>
> > (i) The state of visibility;
> >
> > (ii) The traffic density including concentrations of fishing vessels or any other vessels;
> >
> > (iii) The manageability of the vessel with special reference to stopping distance and turning ability in the prevailing conditions;
> >
> > (iv) At night, the presence of background light such as from shore lights or from back scatter from her own lights;
> >
> > (v) The state of wind, sea and current, and the proximity of navigational hazards;
> >
> > (vi) The draft in relation to the available depth of water.
>
> (b) Additionally, by vessels with operational radar:
>
> > (i) The characteristics, efficiency and limitations of the radar equipment;
> >
> > (ii) Any constraints imposed by the radar range scale in use;
> >
> > (iii) The effect on radar detection of the sea state, weather and other sources of interference;
> >
> > (iv) The possibility that small vessels, ice and other floating objects may not be detected by radar at an adequate range;
> >
> > (v) The number, location and movement of vessels detected by radar;
> >
> > (vi) The more exact assessment of the visibility that may be possible when radar is used to determine the range of vessels or other objects in the vicinity.

{N3133381.1}

61. The Court finds as a matter of law that the operation of the M/V HANNAH C. SETTOON at a speed of approximately 9.5 knots at the time of and the minutes leading up to the collision was not a violation of Rule 6 because 9.5 knots was an appropriate speed under the circumstances.

62. Rule 9 of the U.S. Coast Guard Inland Navigation Rules provides that:

(a)    (i) A vessel proceeding along the course of a narrow channel or fairway shall keep as near to the outer limit of the channel or fairway which lies on her starboard side as is safe and practicable.

(ii) Notwithstanding Rule 9(a)(i) and Rule 14(a), a power-driven vessel operating in narrow channel or fairway on the Great Lakes, Western Rivers, or waters specified by the Secretary, and proceeding downbound with a following current shall have the right-of-way over an upbound vessel, shall propose the manner and place of passage, and shall initiate the maneuvering signals prescribed by Rule 34(a)(i), as appropriate. The vessel proceeding upbound against the current shall hold as necessary to permit safe passing.

(b) A vessel of less than 20 meters in length or a sailing vessel shall not impede the passage of a vessel that can safely navigate only within a narrow channel or fairway.

(c) A vessel engaged in fishing shall not impede the passage of any other vessel navigating within a narrow channel or fairway.

(d) A vessel shall not cross a narrow channel or fairway if such crossing impedes the passage of a vessel which can safely navigate only within such channel or fairway. The latter vessel may use the [ sound | danger ] signal prescribed in Rule 34(d) if in doubt as to the intention of the crossing vessel.

(e)    (i) In a narrow channel or fairway when overtaking, the power-driven vessel intending to overtake another power-driven vessel shall indicate her intention by sounding the appropriate signal prescribed in Rule 34(c) and take steps to permit safe passing. The power-driven vessel being overtaken, if in agreement, shall sound the same signal and may, if specifically agreed to, take steps to permit safe

passing. If in doubt, she shall sound the danger signal prescribed in Rule 34(d).

(ii) This rule does not relieve the overtaking vessel of her obligation under Rule 13.

(f) A vessel nearing a bend or an area of a narrow channel or fairway where other vessels may be obscured by an intervening obstruction shall navigate with particular alertness and caution and shall sound the appropriate signal prescribed in Rule 34(e).

(g) Any vessel shall, if the circumstances of the case admit, avoid anchoring in a narrow channel.

63. The Court finds as a matter of law that Rule 9 is not applicable in this case because the Mississippi River in the area of the collision was approximately 3000' feet wide and, as such, was not a narrow channel. See St. Phillip Offshore Towing Co. v. Wis. Barge Lines, 466 F.Supp. 403 (E.D. La. 1979) ("narrow channel" rule does not apply to area of Mississippi River that ranged from 1000' to 2000' feet wide at the area of the collision).

64. The Court finds as a matter of law that the M/V HANNAH C. SETTOON did not violate Rule 9 by navigating within the boundaries of the Belmont Fairway.

## IV.    OIL POLLUTION ACT OF 1990 ("OPA")

### A.    LIABILITY UNDER OPA

65.  Congress enacted the Oil Pollution Act of 1990, 33 U.S.C. § 2701 *et seq.* ("OPA") in response to the Exxon Valdez oil spill in Prince William Sound, Alaska. *Rice v. Harken Exploration Co.*, 250 F.3d 264, 266 (5th Cir. 2001) (citing Senate Report No. 101-94, re-printed in 1990 U.S.C.C.A.N. 772, 723).  The law was intended to "provide quick and efficient cleanup of oil spills, compensate victims of such spills, and internalize the costs of spills with the petroleum industry." *Id.*

66. OPA applies exclusively to the damages covered under the statute. *Gabarick v. Laurin Maritime (Amer.), Inc.*, 623 F. Supp. 2d 741, 746 (E.D. La. 2009). Accordingly, "OPA preempts general maritime law claims that are recoverable under OPA." *Id.* at 750.

67. When an oil spill occurs on U.S. navigable waters, the Coast Guard typically determines the source of the discharge and notifies a responsible party for that source. *See* 33 C.F.R. § 136.305. A responsible party for a vessel or facility from which oil is discharged is strictly liable for removal costs and damages. 33 U.S.C. § 2702(a). The U.S. Coast Guard designated Settoon the "responsible party" because it was the operator and bareboat charterer of the Barge E2MS-303 from which the oil was discharged.

68. There are three complete defenses to the strict liability imposed by OPA: if the discharge of oil was "caused solely by (1) an act of God; (2) an act of war; [or] (3) an act or omission of a third party . . . ." 33 U.S.C. § 2703(a). Accordingly, a "party involved in an incident could be a responsible party, a sole cause third party, or a non-sole cause third party." *Gabarick*, 623 F. Supp. 2d at 744.

69. Further, OPA also creates a statutory right to seek contribution from any liable or potentially liable person, and it establishes its own statute of limitations. 33 U.S.C. §§ 2709, 2717.

70. As a "responsible party" under OPA for the discharge of oil from the E2MS-303 barge, Settoon can assert a complete defense to strict liability due to the sole fault of a third party. Congress specifically addressed the liability of a third party under Section 2702(d)(1), which provides in pertinent part:

> (A) Except as provided in subparagraph (B), in any case in which a responsible party establishes that a discharge or threat of a discharge and the resulting removal costs and damages were caused solely by an act or omission of one or more third parties de-

Case 2:14-cv-00499-JTM-JCW   Document 102   Filed 12/01/15   Page 35 of 46

scribed in section 2703(a)(3) of this title ..., the third party or parties shall be treated as the responsible party or parties for purposes of determining liability under this subchapter.

(B) If the responsible party alleges that the discharge or threat of a discharge was caused solely by an act or omission of a third party, the responsible party—

(i) in accordance with section 2713 of this title, shall pay removal and    damages to any claimant; and

(ii) shall be entitled by subrogation to all rights of the United States.  Government and the claimant to recover removal costs or damages from the third party or the Fund paid under this subsection.

71. The Court finds as a matter of law that Marquette is the "responsible party" under Section 2702(d)(1)(A) because its negligence was the sole cause of the collision.

72. Section 2713 of OPA provides as follows:

(a) Except as provided in subsection (b) [Presentation to Fund] of this section, all claims for removal costs and damages shall be presented first to the responsible party or guarantor of the source designated under section 2714(a) of this title.

73. Although this Presentment Requirement is mandatory when claims are made by a third-party against the "responsible party," Section 2713's Presentment Requirement does not apply to claims made by a "responsible party" against a sole-cause third-party.  *See Marathon Pipe Line Co. v. LaRoche Indust. Inc.*, 944 F. Supp. 476, (E.D. La. 1996) ("Section 2713 of the OPA, by its own terms, does not require . . . the responsible party to present its claims to . . . the alleged sole cause third party, before filing suit against [said third party].   Nor do any of the other applicable provisions of the OPA incorporate the presentation requirement of § 2713.   Moreover, the statutory structure and the general legislative history of the OPA do not support the contention that a responsible party must first present its claims to an alleged sole cause third party before availing itself of the remedies authorized by the OPA.").

{N3133381.1}

74.  Under 33 U.S.C. § 2702(b), the following subsection of damages are recoverable under OPA:

(1) Removal costs

…

(A) all removal costs incurred by the United States, a State, or an Indian tribe under subsection (c), (d), (e), or (l) of section 1321 of this title, under the Intervention on the High Seas Act (33 U.S.C. 1471 et seq.), or under State law; and

(B) any removal costs incurred by any person for acts taken by the person which are consistent with the National Contingency Plan.

(2) Damages

…

(A) Natural resources

Damages for injury to, destruction of, loss of, or loss of use of, natural resources, including the reasonable costs of assessing the damage, which shall be recoverable by a United States trustee, a State trustee, an Indian tribe trustee, or a foreign trustee.

(B) Real or personal property

Damages for injury to, or economic losses resulting from destruction of, real or personal property, which shall be recoverable by a claimant who owns or leases that property.

(C) Subsistence use

Damages for loss of subsistence use of natural resources, which shall be recoverable by any claimant who so uses natural resources which have been injured, destroyed, or lost, without regard to the ownership or management of the resources.

(D) Revenues

Damages equal to the net loss of taxes, royalties, rents, fees, or net profit shares due to the injury, destruction, or

{N3133381.1}

36

loss of real property, personal property, or natural resources, which shall be recoverable by the Government of the United States, a State, or a political subdivision thereof.

(E) Profits and earning capacity

Damages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources, which shall be recoverable by any claimant.

75.  The Court finds as a matter of law that Settoon is entitled to recover from Marquette its removal costs and any and all damages paid to third party claimants under OPA because Marquette was the sole-cause/responsible party for the discharge.

76.  In the alternative, to the extent that Marquette is not solely at fault for the discharge of oil from Barge E2MS-303, Settoon is entitled to contribution from Marquette to the extent of Marquette's comparative fault under Section 2709.  *See* 33 U.S.C. § 2709 (stating that a responsible party "may bring a civil action for contribution against any other person who is liable or potentially liable under this Act or any other law.").

77.  While a claimant without a proprietary interest in property which is physically damaged does not have a cause of action for purely economic losses under the doctrine of *Robin's Dry Dock,* 275 U.S. 303 (1927), OPA preempts the general maritime law for claims that are recoverable under OPA.  As the Court in *In re Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico,* 808 F.Supp.2d 943, 959-961 (E.D. La. 2011) explained, OPA not only broadened the scope of persons that can recover economic losses resulting from an oil spill, it also created a right of contribution on behalf of the responsible party to recover amounts paid on these economic loss claims from other liable parties.

OPA is a comprehensive statute addressing responsibility for oil spills, including the cost of cleanup, liability for civil penalties, as well as economic damages incurred by private parties and public

> entities…   One significant part of OPA broadened the scope of
> private persons who are allowed to recover for economic losses
> resulting from an oil spill. OPA allows recovery for economic
> losses "resulting from" or "due to" the oil spill, regardless of
> whether the claimant sustained physical damage to a proprietary
> interest…
>
> Clearly, one major remedial purpose of OPA was to allow a
> broader class of claimants to recover for economic losses than
> allowed under general maritime law… Another obvious purpose of
> OPA was to set up a scheme by which a "Responsible Party"
> (typically the vessel or facility owner) was designated and made
> strictly liable (in most instances) for cleanup costs and resulting
> economic damages. The intent is to encourage settlement and
> reduce the need for litigation. Claimants present their claims to the
> Responsible Party, who pays the claims and is then allowed to seek
> contribution from other allegedly liable parties. 33 U.S.C. §§ 2709,
> 2710, 2713.

78.  The Court finds as a matter of law that Settoon is entitled to contribution from Marquette to the extent of Marquette's comparative fault for all removal costs, pollution and cleanup cost as well as all economic loss damages paid by Settoon as the statutory responsible party.

## B.   LIMITATION OF LIABILITY UNDER OPA

79. In lawsuits involving claims under both the general maritime law and under OPA, there are two distinct limitation funds applicable to the different types of claims.   Limitation of liability for claims brought pursuant to the general maritime law or common law, such as the claims for damage to the M/V HANNAH C. SETTOON and for the lost crude oil owned by Valero and discharged as a result of the collision, are governed by the Limitation of Liability Act.  Limitation of liability for claims seeking the recovery of damages recoverable under OPA, such as removal costs and property damage, lost revenues, and other economic losses resulting from a discharge of oil, are governed by the limitation of liability provided for in 33 U.S.C. § 2704. *See Bouchard Transp. Co. v. Updegraff,* 147 F.3d 1344, 1347-1348 (11th Cir. 1998).

80. 33. U.S.C. § 2704, which governs a responsible party's ability to limit its liability following a discharge of oil, provides, in pertinent part, as follows:

(a) General rule

Except as otherwise provided in this section, the total of the liability of a responsible party under section 2702 of this title and any removal costs incurred by, or on behalf of, the responsible party, with respect to each incident shall not exceed—

(1) for a tank vessel the greater of—

(A) with respect to a single-hull vessel, including a single-hull vessel fitted with double sides only or a double bottom only, $3,000 per gross ton;

(B) with respect to a vessel other than a vessel referred to in subparagraph (A), $1,900 per gross ton; or

(C)     (i) with respect to a vessel greater than 3,000 gross tons that is—

(I) a vessel described in subparagraph (A), $22,000,000; or

(II) a vessel described in subparagraph (B), $16,000,000; or

(ii) with respect to a vessel of 3,000 gross tons or less that is—

(I) a vessel described in subparagraph (A), $6,000,000; or

(II) a vessel described in subparagraph (B), $4,000,000;

…

(c) Exceptions

(1) Acts of responsible party

Subsection (a) of this section does not apply if the incident was proximately caused by--

(A) gross negligence or willful misconduct of, or

(B) the violation of an applicable Federal safety, construction, or operating regulation by, the responsible party, an agent or employee of the responsible party, or a person acting pursuant to a contractual relationship with the responsible party (except where the sole contractual arrangement arises in connection with carriage by a common carrier by rail).

81. The Court finds as a matter of law that Settoon is entitled to limit its liability for OPA damages pursuant to 33 U.S.C. § 2704 because Settoon was not grossly negligent and did not commit willful misconduct in causing the collision and was not in violation of any applicable Federal safety, construction, or operating regulation at the time of the collision.

82. The Court finds as a matter of law that Settoon's limitation of liability for OPA damages shall be determined in accordance with 33 U.S.C. § 2704(a)(1)(B) and 33 U.S.C. (a)(1)(C)(ii)(II) because the Barge E2MS-303 from which the oil discharged is a double hulled tank barge of less than 3000 gross tons.

83. The Court finds as a matter of law that Settoon is entitled to limit its liability for all damages recoverable under OPA to a total of $4,000,000.00 in accordance with 33 U.S.C. § 2704(a)(1)(C)(ii)(II) since this amount is greater than the amount of $3,076,100.00 derived by multiplying $1900.00 by 1619, the gross tonnage of the Barge E2MS-303, pursuant to 33 U.S.C. § 2704(a)(1)(B).

84. There is a split amongst U.S. Federal courts regarding the application of OPA's limitation of liability provisions as regards third-party vessel owners against whom a claim for contribution has been brought under 33 U.S.C. § 2709.  On one side, courts have found that, under 33 U.S.C. § 2704, the third-party vessel owner's liability to the responsible party was limited in accordance with the type and size of the third-party vessel owner's vessel involved in the spill.  *Seaboats,*

*Inc. v. Alex C. Corp.*, Nos. Civ. A. 00-12500-DPW, Civ. A. 01-12184-DPW, Civ. A. 01-12186-DPW, 2003 WL 203078 (D. Mass. Jan. 30, 2003). On the other side, courts have found that, under 33 U.S.C. § 2702(d)(2)(B)[1], the third-party vessel owner's liability to the responsible party was coincident with that of the responsible party's liability under OPA. *National Shipping Company of Saudi Arabia v. Moran Mid-Atlantic Corp.*, 924 F.Supp. 1436 (E.D. Va. 1996, *aff'd*, 122 F.3d 1062 (4th Cir. 1997)(Table). This Court agrees with the latter finding and holds that Marquette's liability under OPA is the same as Settoon's liability under OPA. Therefore, Marquette is liable for the full amount of Settoon's liability under OPA.

## V.     LIMITATION OF LIABILITY ACT

85. A vessel owner is entitled to exoneration where it is free from fault. *Tittle v. Aldacosta*, 544 F. 2d 752, 756 (5th Cir.), *reh. denied*, 546 F. 2d 907 (5th Cir. 1977); *In Re Caribbean Sea Transport, Ltd.*, 748 F. 2d 622, 626 (11th Cir. 1984), *amended on other grounds*, 753 F. 2d 948 (11th Cir. 1985).

86. Under the Limitation of Liability Act, a vessel owner may limit its liability for maritime casualties to the "value of the vessel and pending freight." 46 U.S.C. § 30505(a). "However, if the vessel's negligence or unseaworthiness is the proximate cause of the claimant's loss, the plaintiff-in-limitation must prove it had no privity or knowledge of the unseaworthy conditions or negligent acts." *Trico Marine Assets, Inc. v. Diamond B. Marine Servs. Inc.*, 332 F.3d 779, 789 (citing *Cupit v. McClanahan Contractors, Inc.*, 1 F.3d 346, 348 (5th Cir. 1993)); *See* 46 U.S.C. § 30505(b). Privity or knowledge "implies some sort of 'complicity in the fault that

---

[1] "In any other case, the liability of a third party or parties shall not exceed the limitation which would have been applicable to the responsible party of the vessel or facility from which the discharge actually occurred if the responsible party were liable."

cause the accident.'" *Brister v. A.W.I., Inc.*, 946 F.2d 350, 355 (5th Cir. 1991) (quoting *Nuccio v. Royal Indem. Co.*, 415 F.2d 228, 229 (5th Cir. 1969)).

87.  Courts undertake a two-prong inquiry on ascertaining whether a shipowner is entitled to limitation of liability:  (a) the Court must first determine what acts of negligence or conditions of unseaworthiness cause the injury; and (b) the Court must then determine whether the shipowner had privity or knowledge of the same negligent actions or unseaworthy conditions.  *In re Hercules Carriers, Inc.*, 768 F.2d 1558 (11th Cir. 1985); *Verret v. McDonough Marine Service*, 705 F.2d 1437, 1444 (5th Cir. 1983); *Farrell Lines, Inc. v. Jones*, 530 F.2d 7, 10 (5th Cir. 1976); *In re Brasea, Inc.*, 583 F.2d 736, 738 (5th Cir. 1978); *In re State of Louisiana Department of Highways GEORGE PRINCE*, 455 F.Supp. 272, 281 (E.D. La. 1978).

88.  In order for the shipowner to sustain its limitation of liability defense, the burden of proof is on the shipowner to demonstrate that the claimants' losses occurred "without the shipowner's privity or knowledge." *Brister v. A.W. I., Inc.*, 946 F.2d 350, 355 (5th Cir. 1991); *In re Hercules Carriers, Inc.*, 768 F.2d 1558, 1564 (11th Cir. 1985); *Farrell Lines, Inc. v. Jones*, 530 F.2d 7, 10 (5th Cir. 1976); *China Union Lines, Ltd. v. A. O. Anderson & Co.*, 364 F.2d 769, 787 (5th Cir. 19966) *Coleman v. Jahncke Service, Inc.*, 341 F. 2d 956, 957 (5th Cir. 1965); *In re State of Louisiana Department of Highways (GEORGE PRINCE)*, 455 F. Supp. 272, 281 (E.D. La. 1978).

89.  A strict standard of proof is not required of the shipowner to successfully limit liability; the shipowner need only prove its absence or lack of privity and knowledge by a preponderance of the evidence.  *Waterman S.S. Corp. v. Gay Cottons*, 414 F.2d 724, 734 (9th Cir. 1969); *In re Black Sea S.S. Co.*, 382 F. Supp. 907, 911 (D.C.C.Z. 1974).  3 *Benedict on Admiralty*, § 41 and § 91 (7th ed. 1991).

90.  Limitation of liability will be denied the shipowner only where it had "privity and knowledge" of the negligent actions or unseaworthy conditions which caused the casualty. "Privity" means some fault or negligence in which the shipowner (through its shoreside management) personally participates, and "knowledge" means personal cognizance or means of knowledge of which the shipowner (again through its shoreside management) is bound to avail itself of a contemplated loss or condition likely to cause loss, unless proper means are adopted to prevent it.  3 *Benedict on Admiralty*, § 41 (7th ed. 1991).  *See Hernandez v. M/V RAJAAN*, 841 F.2d 582, 591 (5th Cir. 1998); *China Union Lines, Ltd. v. A. O. Andersen & Co.*, 364 F.2d 769, 787 (5th Cir. 1996); *Avera v. Florida Towing Corp.*, 322 F.2d 155, 165-66 (th Cir. 1963).; *In re State of Louisiana Department of Highways (GEORGE PRINCE)*, 455 F. Supp. 272, 281 (E.D. La. 1978).

91.  A causal relationship between the shipowner's privity and knowledge and the claimants' loss is required before limitation of liability will be denied the shipowner.  *In re State of Louisiana Department of Highways (GEORGE PRINCE)*, 455 F. Supp. 272, 281 (E.D. La. 1978); *Farrell Lines, Inc. v. Jones*, 530 F. 2d 7, 10 (5th Cir. 1976); *In re Black Sea S.S. Co.*, 382 F. Supp. 907, 911 (D.C.C.Z. 1974).

92.  The case law is clear that because a corporation operates through individuals, the privity and knowledge of individuals at a certain level of responsibility, must be deemed to be privity and knowledge of the corporation and where the level of responsibility begins must be discerned from the circumstances of each case.  *Continental Oil Company v. Bonanza Corporation,* 706 F.2d 1365 (5th Cir. 1983).

93.  The court faced with an argument by a shipowner that it lacked both privity and/or knowledge makes a factual determination.  The courts do not require only actual knowledge, but,

knowledge which could have or should have been obtained by the shipowner by reasonable inquiry or inspection can qualify. *Cupit v. McClanahan Contractors, Inc.,* 1 F.3d 346 (5th Cir. 1993), *cert. denied*, 510 U.S. 1113 (1994). The courts have applied a "reasonable man" test and where the shipowner and its management are found to have acted reasonably, limitation is granted.

94. The Court finds as a matter of law that the collision was not caused by any act of negligence on the part of Settoon and, thus, Settoon is exonerated from all liability.

95. Alternatively, the Court finds as a matter of law that any negligence on the part of Settoon was strictly as a result of navigational errors of the crew of the M/V HANNAH C. SETTOON and was not within the privity or knowledge of Settoon management and, thus, Settoon is entitled to limit its liability to the value of the M/V HANNAH C. SETTOON.

96. Navigational errors of a vessel master will not be imputed to a vessel owner as long as the owner selected a competent master and did not have actual notice of any pattern of navigational errors. *In Re Kristie Leigh Ent., Inc.,* 72 F.2d 479 (5th Cir. 1996).

97. The Court finds as a matter of law that the valuation of the limitation fund is adequate.

98. The Court finds as a matter of law that the amount of all general maritime claims for which Settoon is liable and that are not recoverable under OPA shall be limited to the value of the limitation fund.

99. The Court finds as a matter of law that Marquette was negligent in failing to adequately train its captains and crew, that this negligence was a proximate cause of the collision, and that this negligence was within the privity and knowledge of Marquette.

100.   The Court finds as a matter of law that Marquette was negligent for failing to enforce safety policies and operations procedures, that this negligence was a proximate cause of the collision, and that this negligence was within the privity and knowledge of Marquette.

101.   The Court finds as a matter of law that Marquette was negligent in assigning inexperienced and incompetent captains and crew to the M/V LINDSEY ANN ERICKSON, that this negligence was a proximate cause of the collision, and that this negligence was within the privity and knowledge of Marquette.

102.   The Court finds as a matter of law that the M/V LINDSEY ANN ERICKSON was unseaworthy at the time of the collision as a result of Marquette's failure to adequately train its captains and crew and failure to assign experienced an competent captains and crew to the M/V LINDSEY ANN ERICKSON, that this unseaworthiness was a proximate cause of the collision, and that this unseaworthiness was within the privity and knowledge of Marquette.

103.   The Court finds as a matter of law that Marquette is not entitled to limit its liability for any general maritime claims for which Marquette is liable and that are not recoverable under OPA.

Respectfully submitted,

*/s/ Jefferson R. Tillery*
JEFFERSON R. TILLERY (La. Bar #17831)
C. BARRETT RICE (La. Bar #30034)
HEATHER L. KIRK (La. Bar #35192)
Jones Walker LLP
201 St. Charles Avenue, 47th Floor
New Orleans, Louisiana  70l70
Telephone:  (504)582-8616
Facsimile:   (504) 589-8238
E-Mail:        jtillery@joneswalker.com
                   brice@joneswalker.com
                   hkirk@joneswalker.com

***Attorneys for Plaintiff in Limitation,***
***Settoon Towing, LLC***

{N3133381.1}

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing document has been forwarded by electronic filing and/or depositing a copy of same in the U. S. mail, postage prepaid and properly addressed this 1st day of December, 2015 to all counsel of record.

<i>/s/ Jefferson R. Tillery</i>
JEFFERSON R. TILLERY

{N3133381.1}