# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: THE MATTER OF SETTOON TOWING, L.L.C., AS OWNER AND OPERATOR OF THE M/V HANNAH C. SETTOON, PRAYING FOR EXONERATION FROM OR LIMITATION OF LIABILITY | ) ) ) ) ) ) ) ) | CIVIL ACTION NO.  14-00499  SECTION "H" (2)  JUDGE JANE TRICHE MILAZZO  MAG. JUDGE JOSEPH C. WILKINSON, JR. |

## AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Marquette Transportation Company, LLC ("Marquette") submits the following Amended Proposed Findings of Fact and Conclusions of Law according to the Court's November 19, 2015, Trial Preparation and Procedures.  (Rec. Doc. 94).  For this Court to assess any fault against Marquette, the Court must find that as Settoon Towing, LLC claims this was a crossing – and not an overtaking – situation in the Mississippi River such that Settoon's much smaller, more maneuverable vessel and tow was the privileged vessel and did not owe Marquette, the much larger, less maneuverable and drifting vessel a duty of a wide berth.  According to the Inland Navigational Rules, this is both factually and legally incorrect.

This case proceeded to trial on December 15, 2015.  The Court, having heard the evidence and reviewed the exhibits, renders the following Findings of Fact and Conclusions of Law.

The U.S. Inland Navigational Rules provide:

> …any vessel overtaking any other shall keep out of the way of the vessel being overtaken.  [Inland Rule 13(a); 33 U.S.C. §2013(a).]

*     *     *     *     *

> Every vessel which is directed to keep out of the way of another
> vessel shall, in so far as possible, take early and substantial action
> to keep well clear.  [Inland Rule 16; 33 C.F.R. § 83.16.]

*     *     *     *     *

In summary, the Court finds that the HANNAH C. SETTOON flotilla proceeding downriver at full speed was obliged to take early and substantial action and keep well clear of the slowly drifting LINDSAY ANN ERICKSON flotilla that HANNAH was overtaking.  Instead, HANNAH's relief captain disregarded her own red flashing collision alarm for more than five minutes and did not steer substantially to starboard but collided with privileged LINDSAY ANN despite more than 1,100 feet of open water – including the downbound lane of the Belmont Crossing -- to HANNAH's starboard side.[1]

To avoid sole fault liability, HANNAH interests ask the Court to disregard the applicable Inland Rules and controlling case law.  HANNAH interests improperly want the Court to focus only on the last two minutes before collision, from 1507-21 (3:07 pm) to 1509-20 (3:09 pm) and to pretend that the Belmont Crossing is a land highway or a safety fairway when it is neither.

The Court finds that LINDSAY ANN held up for HANNAH from 1459 (2:59 pm) until after HANNAH released her to top around at about 1507-21 (3:07 pm).  During this time, LINDSAY ANN – a much larger, less maneuverable 20 barge loaded flotilla — drifts about 300 feet toward the west bank despite her engines being full astern, and steering away from the west bank with her flanking rudders.  LINDSAY ANN's ever increasing drift and HANNAH's

---

[1] After the collision, the U.S. Coast Guard charged HANNAH's relief capt. Calvin Dean with misconduct for violating Inland Rule 13.  "While operating HANNAH, you failed to keep out of the way until past and clear of the LINDSAY during an overtaking situation."  U.S. Guard Suspension and Revocation Proceeding Activity No. 4833433.  HANNAH's relief capt. Dean accepted the charges – without an admission of liability – and agreed to a "Letter of Warning" from the U.S. Coast Guard.

constant collision course with LINDSAY ANN was readily apparent on HANNAH's own Rose Point navigation system, which HANNAH's navigator apparently chose to ignore.   LINDSAY ANN began to top around at about 1508-30 (3:08 pm and 30 seconds) a minute or so after she had been released by HANNAH, and less than one minute before collision.

To use HANNAH's land highway analogy, from 1502 (3:02 pm) onwards through collision, the Court finds that the sports car HANNAH drove at full speed down the wrong side of the highway (the upbound lane of the Belmont Crossing), constantly steering for and ultimately crashing into a big truck (LINDSAY ANN) that HANNAH could see in plain view for at least seven minutes was slowly coasting backwards towards the highway.  Two minutes before the crash, HANNAH called the truck on the cell phone and at minimum told the truck how much she appreciated the truck's good driving.

HANNAH never honked her horn, and was still on the wrong side of the highway when she struck the slowly moving truck — which never crossed the highway centerline (the upbound lane of the Belmont Crossing).  If HANNAH had driven down the correct side of the highway (the downbound lane of the Belmont Crossing), the collision could not and would not have happened.

Of course, in maritime law, the Court finds that the HANNAH was <u>not</u> properly navigating in the upbound lane of the Belmont Crossing, and should have been even further over toward the west bank.  In fact, within 1-2 minutes after the crash, that is where she was driving, as she should have easily done for the prior fifteen minutes to comply with its statutory duty to provide LINDSAY ANN with a wide berth.

- 3 -

## Background

1.      At all material times, the vessel LINDSAY ANN ERICKSON ("LINDSAY ANN") was owned and operated by defendant Marquette Transportation Company, LLC ("Marquette"). The LINDSAY ANN is a 6,800 horsepower towing vessel built in 1982. The LINDSAY ANN measures 168 feet in length by 40 feet in width.  The LINDSAY ANN was pushing 20 loaded grain barges in a block  about 1,000 feet in length and 175 feet wide.  Each grain barge measured 198 feet in length and 38 feet in breadth.  Total LINDSAY ANN flotilla length including LINDSAY ANN was about 1,168 feet (about four football fields).

2.      The HANNAH C. SETTOON ("HANNAH"), which is owned by Settoon Towing, LLC ("Settoon"), is a 2,600 horsepower towing vessel built in 2010 and measures 88 feet in length by 35 feet in width.  The HANNAH was pushing abreast only two (2) tank barges, including the E2-MS303, which measures 297 feet in length by 54 feet in width, so that total length of the HANNAH flotilla was 385 feet (about one football field).  E Squared Marine, LLC, owns the barge E2-MS303, which was built in 2013.

3.      Both the LINDSAY ANN and HANNAH flotillas were shallow draft, capable of navigating in only about fifteen (15) of water.  At all times, both flotillas could navigate safely almost the entire "bank to bank" 3,000 foot width of the Mississippi River. (LINDSAY ANN navigation consultant, Captain Mike Hilton ("Hilton") at report page 4).

4.      The LINDSAY ANN and HANNAH both were equipped for navigation with Electronic Chart Displays ("ECDIS") manufactured by Rose Point ("Rose Point"), the industry

standard.  (Marquette Ex. 3 & 4).  LINDSAY ANN's Rose Point was up to date showing the correct location of the Belmont Crossing Range.  (Marquette Ex. 3).  In contrast, HANNAH's Rose Point did not show the correct location of the Belmont Crossing Range Channel even though relief captain Dean thought he had updated it properly.. (Marquette Ex. 4; Deposition of relief captain Calvin Dean ( "Dean") at 116:19-117:12).  This might explain why HANNAH's navigators could have thought they were properly positioned even though they were in the upbound lane of the Belmont Crossing. Of note, shortly before trial, Settoon altered its position to state that because its relief captain clicked on the icon to update his Rose Point chart, relief captain Dean must have been mistaken in his testimony that he was using the incorrect chart even though that is the electronic chart that Settoon produced in discovery to Marquette.   Regardless, relief captain Dean testified that the chart Marquette examined him with during his deposition was the chart he was using at the time of the collision, which reveals the Belmont Crossing in the old location.

5.    Nearby AEP fleet towboat SAFETY RUNNER, like LINDSAY ANN, was equipped with a modern, up to date, corrected Rose Point showing the correct location of the Belmont Crossing deep draft channel.  (Marquette Ex. 5).

6.    The Rose Point navigation systems automatically and objectively record vessel location and movement on a proven industry standard electronic chart.

7.    The U.S. Coast Guard Vessel Traffic Service ("VTS") Automatic Identification System ("AIS") Electronic Chart Display is used by VTS traffic controllers to monitor vessel traffic on the Mississippi River.  (Marquette Ex. 1 & 2).  This objective, independent,

U.S. Government record also automatically records vessel location and movement, as well as bridge to bridge VHF radio communications.

8.    At trial, Marquette offered five objective electronic computer generations with engrained navigational information that were recorded in real time as the events surrounding this collision occurred:

    (a)    U.S. Coast Guard AIS ECDIS Data (upriver) (In real time: 14:40 to 15:23 hours);

    (b)    U.S. Coast Guard AIS ECDIS Data (downriver) (In real time: 14:25 to 15:25 hours);

    (c)    Rose Point data from third party AEP's SAFETY RUNNER vessel (In real time: 15:00 to 15:30 hours);

    (d)    Rose Point data from the LINDSAY ANN (In real time: 15:00 to 15:30 hours);

    (e)    Rose Point data from the HANNAH (Produced by Settoon only at 4x actual speed: 15:05 to 15:11 hours).

9.    As set forth above, Settoon only produced in its original discovery to Marquette a <u>six minute</u> excerpt from the HANNAH's Rose Point system, and what Settoon did produce was at <u>4x the speed at which the collision actually occurred</u>.   In addition, to minimize the damage done to their account by their own Rose Point, HANNAH interests failed to provide to this Court a "real time" replay of the HANNAH Rose Point from the pertinent times 1500 hours (3:00 p.m.) until 1530 hours (3:30 p.m.).   Instead, they  produced a "sped up" (4x speed) Rose Point only from 1505 hours (3:05 p.m.) to 1511 (3:11 p.m.) hours. (Marquette Ex. 4).   Settoon failed to explain why it could not produce and rely upon the full 30 minutes of Rose Point data that Marquette and AEP produced so that the Court could observe independently what HANNAH's relief captain Dean saw or should have seen in real time from her bridge.

10. Providing a replay from 1505 – 1511 that displays ECDIS screens and prints out data points only every four seconds in a "fast forward" format prevented the Court from viewing 3/4 of the ECDIS screens and data points, and does not allow a true appreciation of how events happened in real time.  In addition, not providing the HANNAH replay from 1500 – 1505 and 1511 – 1530 (24 minutes total out of 30 minutes) precluded the Court from seeing 80% of the HANNAH Rose Point pertinent data during the limited time period that Settoon did provide.

11. Finally, the replay feature HANNAH interests produced at trial did not include the vitally important "vessel information list" on the right side of the HANNAH Rose Point screen, on which a second large red blinking collision alarm would warn HANNAH of her unsafe approach to LINDSAY ANN, and provide a digital readout of LINDSAY ANN's drift toward the west bank in addition to the LINDSAY ANN COG vector drift display seen on HANNAH Rose Point ECDIS screen.  (Marquette Ex. 4).

12. Instead of producing its Rose Point navigational information for the 30 minute period in real time surrounding the casualty as the other parties did, Settoon asked its expert Tim Anselmi to provide certain limited data to Settoon's counsel's employee Jones Walker's web site developer Mr. Frank Hutchinson to prepare various computer generated animations of the collision at 10x the normal speed (in other words, fast forwarded 10 times the actual speed of the incident) using Adobe Flash Professional CS5.5, which is not a navigational charting system used by navigators in the maritime industry.  In an attempt to minimize its own fault, Settoon's efforts at trial centered around attempting to speed up the circumstances of the collision to try to give the impression that the

HANNAH's pilot had much less time to navigate properly than was actually the case; otherwise, there would be no reason for Settoon to proffer such computer animations in anything other than in real time as they actually occurred.

13.   The Court notes that the various versions of Mr. Hutchinson's computer generated animations changed over time, which in addition to the fact that it was sped up at 10x the rate of occurrence, reflects upon the lack of its value as either demonstrative or substantive evidence in this case.  The Court further notes that Settoon has attempted to liken this collision to an automobile accident, and the unreliability of asking this Court to consider any such animations at 10x the rate at which the navigators perceived them at the time of the collision is self-evident.  In addition, Marquette demonstrated at trial the animations inaccurately depict both the HANNAH's and the LINDSAY ANN's positions in the Mississippi River at various points and also does not contain latitude and longitude information so there is no way to verify the accuracy of the river, the river banks, and other relevant information plots in relation to where the vessels' positions are identified.

14.   The Court finds that the independent, objective Rose Point and U.S. Coast Guard VTS AIS corroborates LINDSAY ANN navigator's testimony of Capt. David Clark and is fatal to HANNAH interests' account.

## The Incident

15.   The larger, slower LINDSAY ANN flotilla was down bound in the Mississippi River where LINDSAY ANN initially was scheduled to drop off three barges at AEP River Operations' ("AEP") barge fleet facility in Convent, Louisiana ("Convent Fleet").

16.    The smaller, faster, more maneuverable HANNAH flotilla initially was several miles behind the LINDSAY ANN flotilla, but rapidly catching up and all were aware HANNAH would be overtaking LINDSAY ANN.   (Dean at 212:1-8; Deposition of James Carlos Clark ("Clark") at 162:20).

17.    Before LINDSAY ANN reached Convent Fleet, AEP instructed the LINDSAY ANN instead to proceed south of the bend at College Point, and proceed  to AEP's barge fleeting facility at Belmont ("Belmont Fleet"). There, the AEP fleet boat SAFETY GLORY would meet the LINDSAY ANN flotilla in the middle of the river help the LINDSAY ANN flotilla to "top around" – turn the entire tow counterclockwise until heading upriver, and position her on the left descending (east) bank about 1.5 miles below College Point so that the LINDSAY ANN could drop off the three AEP barges. SAFETY GLORY's Rose Point was not turned on.

18.    SAFETY GLORY is a 1,550 horsepower fleet towboat with dimensions of 70 feet in length, 28 feet in breadth and a deep draft of about 12 feet.  She is owned by AEP, Inc. who operate the upper and lower Belmont Fleets.  She regularly shuttles barge flotillas of 4-6 standard river barges around College Point between the Belmont Fleets and also other barge fleets upriver and downriver.  When loaded, and made up 3 x 3, such barge flotillas have a length of about 600 feet, a breadth of 120 feet and a depth of 12 feet.  Such flotillas are similar in size to the HANNAH flotilla.

19.    Capt. Pat Ivey was operating SAFETY GLORY the day of the incident.  He is an experienced Mississippi River towboat captain and is an independent witness in this case. The Court finds his testimony helpful and credible.

20.     At 1445 hours, the LINDSAY ANN passed the College Point bend and thereafter was slowing down and waiting on the assist fleet tug SAFETY GLORY to arrive.  (Marquette Ex. 1).

21.     At about the same time, as demonstrated by the USCG VTS AIS, HANNAH safely met the upbound ship CETUS OCEAN above College Point, HANNAH properly shaping her course to pass midway between the ship and the right descending "west" bank of the river.  (Marquette Ex. 1).

22.     M/V CETUS OCEAN is a large oceangoing deep draft 13,000 horsepower Panamax bulk carrier.  Her dimensions are 751 feet in length, 105 feet in breadth, with tonnages of 43,656 gross, and 82,986 deadweight.  Thereafter, she was not a factor in any involved vessels' navigation.[2]

---

[2] Uncontested dimensions from the "Equasis" website.

**HANNAH meeting CETUS OCEAN at 1445-15 (24 minutes before collision)**



23. Also at 1445-15, the USCG VTS AIS shows upbound/northbound DENNIS HENDRIX pushing a flotilla of 35 loaded barges can be seen proceeding safely and without incident up the right descending "west bank" side of the river about 500 feet off the river bank. (Marquette Ex. 1).

24. The pertinent relationship between the HANNAH and LINDSAY ANN began about fifteen minutes later, at 1458 hours, when the HANNAH was in the College Point bend at a distance of approximately 3,500 feet astern of the LINDSAY ANN. (Marquette Ex. 1). At this time, the vessels entered into two navigational agreements:

(a) The slowing down and almost stationary LINDSAY ANN reached a one whistle overtaking agreement with the down bound HANNAH, such that the burdened, give way HANNAH would overtake the privileged, stand on LINDSAY ANN midway between LINDSAY ANN and the right descending "West" bank of the Mississippi river, then an open water distance of almost 1,500 feet.

     (b)     A hold up agreement was made whereby the LINDSAY ANN agreed to hold up and wait for the HANNAH to pass before starting her top around.   (Hilton at pg. 1-2.)

25.    When these agreements were being made, the HANNAH was meeting the large upbound tow, the DENNIS HENDRIX flotilla (35 barges) which HANNAH met starboard to starboard midway between the DENNIS HENDRIX flotilla and the College Point river bank.  (Marquette Ex. 1).  The DENNIS HENDRIX is a line boat owned by American Commercial Lines, LLC.  Her dimensions are 180 feet in length, and 52 feet in breadth. She is a 10,000 horsepower triple screw line boat.   The DENNIS flotilla precise dimensions are not known.  Generally, a 35 loaded barge tow will be made up 5 x 6 or 1200 feet in length and 210 feet in breadth, with a controlling draft in the 12-15 foot range.  The overall (line boat and barges) would be 1380 feet, flotilla breadth 210 feet.[3]

**HANNAH/DENNIS HENDRIX meeting at 1459 (about 10 minutes before collision)**



---

[3] The U.S. Coast Guard VTS AIS ECDIS notes DENNIS HENDRIX was pushing 35 loads.

26.   After meeting the DENNIS HENDRIX flotilla, the HANNAH was on the left descending "east" bank side of midriver. (Marquette Ex. 1).

27.   Thereafter, in violation of Inland Rules 13(a) and 16, HANNAH did not properly shape her course to pass midway between LINDSAY ANN and the riverbank as HANNAH did a few minutes earlier with the CETUS OCEAN and the DENNIS HENDRIX flotilla. (Marquette Ex. 1; Deposition of Captain Pat Ivey ("Ivey") at 156:3-158:5; Clark at 118:11-13).

28.   Instead, although proceeding downriver, HANNAH shaped her course directly at the LINDSAY ANN flotilla while always improperly navigating in the upbound lane of the Belmont Crossing.  The objective, independent evidence of the VTS AIS and HANNAH Rose Point navigation chart shows HANNAH's course over ground ("COG") vector (solid line extending out from HANNAH's icon) showing the actual path HANNAH will track down in the next three minutes was directly pointed at the LINDSAY ANN on a collision course almost the entire time after HANNAH passed College Point.  (Marquette Ex. 1 & 4).

29.   Likewise, the objective, independent evidence of the HANNAH, LINDSAY ANN and T/B SAFETY RUNNER's Rose Point ECDIS navigation systems show HANNAH COG vector (a dotted line on the Rose Point system) showing the actual path HANNAH will track down (in the next six minutes on HANNAH Rose Point) was directly pointed at the LINDSAY ANN on a collision course almost the entire time after HANNAH passed College Point.  (Marquette Ex. 3, 4, & 5).

30.  During the entire time leading up to the collision, the HANNAH own Rose Point navigation collision alarm was flashing red, which warned HANNAH relief captain Dean that by navigating in the upbound lane of the Belmont Crossing he was at risk of collision with the SAFETY GLORY and the LINDSAY ANN flotilla almost the entire time HANNAH approached the LINDSAY ANN flotilla from behind.  (Marquette Ex. 3).

31.  Instead of making an early and substantial course change to starboard, HANNAH operator in violation of Inland Rule 8(b) remained in the upbound lane of the Belmont Crossing and only made a series of small, incremental starboard course alterations. Despite the risk of collision, HANNAH did not reduce speed, but continued downriver at a speed over ground ("SOG") of about 9.6 knots (11 mph).

**HANNAH Rose Point at 1505-18 hours (4 minutes before collision)
showing red flashing collision alarm with assist tug SAFETY GLORY**



**HANNAH Rose Point at 1506-32 hours (3 minutes before collision)
showing red flashing collision alarm with LINDSAY ANN**



**HANNAH Rose Point at 1507-12 hours (2 minutes before collision)
showing red flashing collision alarm with LINDSAY ANN**



32.   The Court finds that a reasonable explanation for the HANNAH's improper navigation was that relief captain Dean was not properly monitoring his charts and/or that he had not properly updated his Rose Point chart as he claims and/or that his chart did not show the deep draft Belmont Crossing Range Channel in its present position, but closer to where the LINDSAY ANN was. (Marquette Ex. 3; Dean at 116:19-117:12).   Otherwise,

HANNAH navigation targeting LINDSAY ANN between 1502 through the collision by remaining in the upbound lane of the Belmont Crossing while going downriver is inexplicable.

33.   Marquette's Capt. David Clark, who made a credible witness, testified that (1) mariners on the river know that large line tows like the LINDSAY ANN when holding up with their head downriver and their stern upriver cannot remain stationary in the following current (Clark at 114:7-19); (2) large line tows like LINDSAY ANN must use their engines astern and use their flanking rudders to try to keep their stern up into the current, while the current tries to push their tow around sideways, perpendicular to the current (Clark at 94:20-25; 157:7-12); (3) mariners understand that large line tows will drift depending how the river current pushes their stern, which is why large line tows do not navigate upriver stern first.  (Clark at 94:20-25; 157:7-12).

34.   Independent witness Capt. Pat Ivey aboard nearby AEP towboat SAFETY GLORY testified the same, that the LINDSAY ANN flotilla would and did drift slowly towards the west bank while waiting for the HANNAH flotilla to overtake.  This is normal and customary.  (Ivey at 184:22-185:15).

35.   During the hold up agreement between 1459 and 1507-21, in plain sight of approaching HANNAH, the LINDSAY ANN drifted more than 300 feet downriver and towards the west bank (average speed over eight minutes about 37 feet/minute).  (Marquette Ex. 1).

36.   HANNAH's own Rose Point system informed her operator that the LINDSAY ANN flotilla was drifting toward the west bank at .46 miles per hour four minutes before the collision, at .69 miles per hour three minutes before the collision, and .81 miles per hour

at 1507-21 hours (3:07 p.m. and 21 seconds) two minutes before the collision at about 1509-20 hours. (Marquette Ex. 4).   The preceding three screen shots show how HANNAH's Rose Point not only warned the HANNAH captain with flashing red icons, but also named the vessel ("LINDSAY ANN ERICKSON") and showed her drift speed toward the west bank into LINDSAY ANN's side (upbound lane) of the Belmont Crossing.  (Marquette Ex. 4).

37.  By his navigational movements and lack of communication to the LINDSAY ANN, HANNAH relief capt. Dean evidenced he was comfortable with the LINDSAY ANN's drift towards the west bank.  (Marquette Ex. 1, 4, & 5).  Specifically while approaching the LINDSAY ANN from behind in clear visibility, with an unobstructed view forward, the HANNAH operator saw LINDSAY ANN's more than 300 foot drift towards the west bank and never expressed any concern or blew the danger signal.

38.  To the contrary, all can hear HANNAH's relief captain Dean release LINDSAY ANN from the hold up agreement during their VHF radio exchange between about 1507-21 and 1507-30 hours, less than two minutes before collision.  (Marquette Ex. 1).  At 1507-30 there was still more than enough time and distance for the HANNAH flotilla to maneuver well clear of the LINDSAY ANN, and to shape her course to pass midway between LINDSAY ANN and the west bank of the river, then an open water distance of about 1200 feet. (Ivey at 185:22).  At a bare minimum, had the HANNAH been navigating on its side (downbound side) of the Belmont Crossing, the collision would have been avoided.  (Marquette Ex. 4).

39.     In particular, the Court notes the exact wording of the VHF radio communication between HANNAH and LINDSAY ANN.   HANNAH relief captain Dean radioed LINDSAY ANN at 1507-21 and calmly stated, **"Appreciate your patience there LINDSAY ANN, ya'll have a good evening.  The HANNAH."**  LINDSAY ANN Pilot Clark responded to the HANNAH, **"No problem there HANNAH y'all have a safe one on down.  The LINDSAY."**  (Marquette Ex. 1).  The exchange concludes at about 1507-30, less than two minutes before collision.  (Marquette Ex. 1).

40.     Significantly, Settoon's theory of the case hinged on its allegation that that this was a crossing – and not an overtaking – situation.

41.     The Inland Navigational Rules of the Road set forth at 33 C.F.R. § 83.01, *et seq.* contemplate three approach situations: head-on, overtaking, and crossing.  The head-on encounter is defined as a meeting situation by two power-driven vessels on reciprocal or nearly reciprocal courses.  The overtaking encounter is a faster vessel coming up from behind and passing a slower vessel.   A crossing encounter is nothing more than approaching another vessel from her port or starboard side.  What separates a crossing from an overtaking situation hinges *solely on the angle of approach*. Overtaking Rule 13(b) recites the dividing line between a crossing and overtaking situation:

42.     Inland Rule 13(b) states:

"A vessel **shall** be deemed to be overtaking when coming up with another vessel from a direction more than 22.5 degrees abaft her beam; that is, in such position with reference

- 18 -

to the vessel she is overtaking, that at night she would be able to see only the stern light [135 degree blue sector, *see Figure 1 below*] of that vessel, but neither of her sidelights."[4]

43.    So, if a vessel approaches another vessel from a direction more than 22.5 degrees abaft her beam, that is, in such a positon where her approach is within the 135 degree arc of visibility of the stern (behind) light of that vessel (blue sector shown in Figure 1 below), the approach is an overtaking situation ***and not*** a crossing situation.

44.    The diagram below portrays the 135 degree arc of visibility and the difference between a crossing and overtaking approach.  The diagram also illustrates the meaning of the "***see only the stern light***" overtaking rule.  For this Honorable Court's reference, the blue shaded sector in Figure 1 depicts the vessel's 135 degree stern (behind) light arc, whereas the red and green sectors depict the vessel's starboard (right) and port (left) sides respectively.  When a vessel like HANNAH approaches another vessel like LINDSAY ANN within this blue 135 degree sector, an overtaking relationship exists:

---

[4] 33 C.F.R. § 83.13 (emphasis added).

**Figure 1: 135 degree blue stern light diagram**

**Crossing Vessel:** If you are approaching a vessel from the red **OR** green sector you are a crossing vessel.

Crossing vessels

**other vessel**

**Overtaking-Vessels** Inside 135 degree blue sector

**Overtaking Vessel:** If you are approaching another vessel 22.5 degrees abaft her beam (within the 135 degree this blue stern light sector) you are an overtaking vessel.

45.     As noted above, the blue shaded sector shown here represents the 135 degree arc of light

that is projected from a vessel's stern (behind) light. An overtaking relationship is in

existence if a vessel (HANNAH) approaches another vessel (LINDSAY ANN) within

this 135 degree arc.  Conversely, if a vessel approaches another vessel outside this blue

arc, then there is no overtaking situation; rather, the relationship will be either a crossing or head-on approach.

46.     Fortunately, as set forth above, there are **five** contemporaneous objective electronic navigational computer recordings with engrained electronic navigational information that accurately depict the events surrounding this collision:[5]

1.      U.S. Coast Guard AIS ECDIS Data (upriver) (<u>In real time</u>: 14:40 to 15:23 hours) (click for hyperlink)



2.      U.S. Coast Guard AIS ECDIS Data (downriver) (<u>In real time</u>: 14:25 to 15:25 hours) (click for hyperlink)

3.      Rose Point data from third party AEP's SAFETY RUNNER vessel (<u>In real time</u>: 15:00 to 15:30 hours) (click for hyperlink)

4.      Rose Point data from the LINDSAY ANN (<u>In real time</u>: 15:00 to 15:30 hours) (click for hyperlink)

5.      Rose Point data from the M/V HANNAH (<u>4 x actual speed</u>: 15:05 to 15:11 hours) (click for hyperlink)

47.     The Court finds that this was an overtaking situation because the above five contemporaneous objective electronic navigational computer recordings indisputably establish HANNAH was positioned inside LINDSAY ANN's 135 degree stern (behind)

---

[5] *See* corresponding hyperlinks.

light blue sector from the time HANNAH came around College Point river bend all the way through impact.  The five objective ECDIS recordings prove this point.  Figures 2, 3, and 4 provide screen shots of Rose Point data from AEP's SAFETY RUNNER; Settoon's HANNAH; and Marquette's LINDSAY ANN that captures HANNAH's position in relation to LINDSAY ANN's 135 blue stern (behind) light arc about twelve seconds before impact.  For efficiency purposes, screens shots are only provided for this time shortly before impact, even though all screen shots prove this basic point.  The five objective recordings demonstrate that HANNAH was always within the 135 degree blue stern (behind) light arc prior to impact.



Figure 2: Rose Point data from LINDSAY at 1509-08

Assist tug **SAFETY GLORY** positioned on the starboard head of LINDSAY's 20 barge tow

**LINDSAY'S 20 barge tow**

**LINDSAY**

**HANNAH** always inside LINDSAY's 135 degree blue sector.

48.     Note, the Rose Point data in Figure 2 comes from the LINDSAY ANN and shows the outline of her 20 barge tow. This data was manually entered into the LINDSAY ANN's Rose Point system by the vessel prior to her departure.  The Rose Point data depicted in Figures 3 and 4 come from the AEP vessel SAFETY RUNNER and HANNAH and do not show the outline of LINDSAY ANN's 20 barge tow.  This diagram (Figure 2) shows AEP assist tug SAFETY GLORY on the starboard head of LINDSAY ANN's 20 barge tow at 1509-08 hours.[6]  So, the position of SAFETY GLORY in Figures 3 and 4 also show where the starboard head of LINDSAY's tow was located at 1509-08 as well.

---

[6] This is 1509 minutes and 08 seconds.



**Figure 3: Rose Point data from AEP assist tug SAFETY RUNNER at 1509-08**

Assist tug **SAFETY GLORY** positioned on the starboard head of LINDSAY's 20 barge tow

**HANNAH** always inside LINDSAY's 135 degree blue sector.



Figure 4: Rose Point data from HANNAH at 1509-08

Assist tug **SAFETY GLORY** positioned on the starboard  head of LINDSAY's 20 barge tow

**HANNAH** always inside LINDSAY's 135 degree blue sector.

49.   As the 1509-08 hours screen shots above demonstrate, at no point during HANNAH's

overtaking of LINDSAY ANN was HANNAH <u>ever</u> coming up on LINDSAY ANN from

a direction less than 22.5 degrees abaft LINDSAY ANN's beam (outside the 135 degree

blue arc).[7]  The screen shots taken just 12 seconds before impact shows HANNAH well

within the blue 135 degree stern (behind) light arc.  Due to these simple facts, HANNAH

and LINDSAY ANN were always in an overtaking situation (Rule 13) prior to impact.

---

[7] *See* Figures 2, 3, and 4.

**The Release**

50.     Independent witness Capt. Ivey at his deposition testified HANNAH released LINDSAY

ANN from the hold up agreement when HANNAH and LINDSAY ANN communicated

at 1507-21.

> Q. Any reason after this conversation between the HANNAH and
> the LINDSAY why the LINDSAY can't start topping around, if
> she wanted to?
>
> A. It's possible, yes.  Under my understanding that – if I recall, I
> heard the LINDSAY say "once you pass," I recall, "that we'll start
> our top."
>
> Q. That's right.   That's five or six minutes ago, and now the
> HANNAH calls to the LINDSAY and says, "Hey, yeah.  Okay.
> Thanks for stopping there, buddy.  Yeah.  Allright.  Very good.
> Thank you."  — Does it sound like HANNAH's (the hold up is) all
> over?
>
> A. Correct.[8]

51.     HANNAH counsel also understood Capt. Ivey testified HANNAH released LINDSAY

ANN from holding up in the conversation between 1507-21 and 1507-30:

> Q. And I believe – I thought I heard you say earlier that you
> thought it was okay for him (LINDSAY ANN) to start topping
> around then.  And I just want to make sure that…
>
> A. That's just my opinion.[9]

52.     Then HANNAH's counsel replayed the original hold up agreement conversation at 1458-

1459 hours, in which LINDSAY ANN agreed to hold up until HANNAH had passed.  In

that context HANNAH counsel asked Capt. Ivey about the original hold up agreement:

---

[8] Ivey deposition, p. 183, lines 7-22 (parenthetical added for context of the preceding page).
[9] Ivey deposition. P. 238, lines 15-19.

Q. And earlier today, you heard the captain of the LINDSAY agree that he would not begin to top around until after the HANNAH SETTOON had passed, correct?

A. Yes.

Q. So you agree with me, then, that it would be an error for the LINDSAY ANN to begin to top around prior to the HANNAH SETTOON passing, because that would be in violation of their agreement?

A. I agree with that.[10]

53.  There is no question in the full context of events that afternoon that Capt. Ivey thinks

HANNAH released LINDSAY ANN to top around at 1507-21:

Q. But for the HANNAH SETTOON steering as she did, being where she was, was there anything unusual about the way the LINDSAY was topping around?

A. No, sir.[11]

******** 

Q. What was the only thing unusual that day?

A. The only thing unusual that day, as I noticed, within 8 or 900 foot that the SETTOON was – the HANNAH SETTOON was aimed right toward the LINDSAY ERICKSON.  Other than that, nothing, the whole scenario.  Other than the topping, all of that went fine.[12]

******** 

Q. What practice do you have?  Is it your practice to close shave the sterns of vessels that you are going by, or do you aim for the midpoint (between the vessel and the river bank)?

A. Midpoint, plus less dangerous side of the river.[13]

---

[10] Ivey deposition, p. 240, lines 15-24.
[11] Ivey deposition, p. 257, lines 14-19.
[12] Ivey deposition, p. 258, lines 4-10.
[13] *Id.* p. 190, lines 5-11 (parenthetical added for context of preceding page questions).

******** 

Q. So to summarize what you have said, there's nothing unusual about where the LINDSAY ANN is at, what the LINDSAY ANN is doing, what the SAFETY GLORY is doing.  The only thing unusual is the HANNAH SETTOON being mighty close to the stern of the LINDSAY?

A. Correct.[14]

******** 

Q. What did the LINDSAY ANN do wrong?

A. I don't see where it did anything wrong.[15]

54.    There is a dispute between the parties whether this communication was a release of the "hold up" agreement (LINDSAY ANN contends) or if it was merely a confirmation of the earlier "one whistle" overtaking agreement (HANNAH contends).    Because HANNAH operator never mentions "one whistle" but says "appreciate your patience," and LINDSAY ANN is holding up waiting for clearance from HANNAH, and based on the credible testimony of LINDSAY ANN witnesses, the Court finds the hold up agreement was now complete and from 1507-30 onward the LINDSAY ANN was free to begin to top around.

55.    In any event, the Court does not attach any talismanic significance to the hold up agreement or to whether or not the hold up agreement was released.  Even if the hold up agreement was released, Inland Rule 17 requires the privileged "stand-on" vessel like LINDSAY ANN to keep her course and speed, subject to conditions such as current drift and other anticipated and expected river conditions and maneuvers as will be discussed

---

[14] *Id*. at p. 201, lines 9-15.
[15] *Id*. at p. 210, lines 17-18.

- 28 -

later. [16]

56.   If HANNAH is keeping well clear, LINDSAY ANN cannot suddenly sheer half way across the river in front of HANNAH with impunity.  But as of 1507:12 HANNAH's own Rose Point warns HANNAH by red flashing alarm that HANNAH is still on collision course with LINDSAY ANN, as HANNAH has been for at least the past five minutes.  HANNAH was not keeping well clear of LINDSAY ANN.  Nor did LINDSAY ANN suddenly sheer half way across the river.

57.   Also, Inland Rule 17(d) emphasizes that the give-way vessel (HANNAH) is still obliged to keep out of the way of the stand-on vessel (LINDSAY ANN).[17]

58.   The overtaking agreement was still in effect, and HANNAH was obliged to keep well clear of privileged LINDSAY ANN.

59.   Notably, the navigable width of the river for both the LINDSAY ANN and HANNAH flotillas in this particular area is essentially "bank to bank" a distance of approximately 3000 feet.  While the Belmont Fleet like all barge fleets does extend out into the river about 300 feet from the left descending ("east") bank of the river here, there is no barge fleet at all along the west bank until almost two miles downriver.  (Marquette Ex. 1, 2, 3, & 5).

---

[16] After collision, the U.S. Coast Guard charged LINDSAY ANN's pilot Clark with misconduct for violating Inland Rule 17.  In particular for starting to top around before the HANNAH flotilla had overtaken the LINDSAY ANN flotilla.  U.S. Coast Guard Suspension and Revocation Proceeding Activity No. 4828892.  LINDSAY ANN's Capt. Clark accepted the misconduct charges – without admission of liability – and agreed to a suspension of his license during his regular time off while he completed an Inland Rules of the Road course; then three months' probation while he kept working as captain, completing same by the end of July 2015.  During the same time period, Marquette promoted him to full captain.

[17] 33 C.F.R. § 83.17.

60.   LINDSAY ANN pilot Clark had no concern at 1507-21 that the HANNAH was going to collide with the LINDSAY ANN because the HANNAH had only 2 barges in tow with 1200 feet of open, navigable water clearance between the LINDSAY ANN and the west bank such that the HANNAH easily should have been able to pass midway between the LINDSAY ANN and the west bank.  (Clark at 112:3-8).

61.   There was more than sufficient room for HANNAH to safely navigate in the downbound lane of the Belmont Crossing and also at least 500 to 600 feet off the west bank, midway between LINDSAY ANN and the riverbank, just as HANNAH had done with the ship CETUS OCEAN and the line tow DENNIS HENDRIX.  (Ivey at 185:22, 189:16-22, & 212:2-3; Clark at 197:12-20).  Indeed, the U.S. Coast Guard VTS AIS shows DENNIS HENDRIX had just 20-30 minutes earlier pushed a 35 barge loaded flotilla upriver along the west bank exactly where the HANNAH flotilla should have been by 1509 hours.  (Marquette Ex. 1 & 2).

62.   The objective Rose Point Electronic Chart Display (ECDIS) vectors demonstrate that even if LINDSAY ANN had not topped around, but had continued with her uncontested increasing rate of drift from 1507-21 onwards, HANNAH likely still would have collided with LINDSAY ANN – unless HANNAH had turned substantially to starboard, which she did not do.  (Marquette Ex. 3, 4, & 5).

63.   Between 1508 and 1509, at about 1508-30,  the LINDSAY ANN flotilla slowly began to top around.  Topping around is basically turning in place, sometimes with a bit of headway, sometimes with a bit of sternway.  Also, all are aware when topping around the flotilla is still subject to drift, just like when holding up.  LINDSAY ANN drifted at least

100 feet toward the west bank between 1507-21 and 1509 – about 70 feet per minute – turtle slow and readily visible to HANNAH.  (Marquette Ex. 1, 3, 4, & 5).

64.     It is uncontested that HANNAH did not protest or signal any disagreement with LINDSAY ANN drift from 1507 to 1508, or when LINDSAY ANN began to top around after 1508-30.  (Marquette Ex. 1, 3, 4, & 5).

65.     At 1509 hours, while just upriver of LINDSAY ANN and traveling at a speed over ground of 9.6 knots - 960 feet per minute - the HANNAH pilot radioed to the LINDSAY ANN and stated, "**It looks like we are going to hit each other there Skip…**" (Marquette Ex. 1).  LINDSAY ANN then attempted to go full ahead with both engines and steer away to avoid a collision, but HANNAH's announcement was too late, as line boat engines take time to come to power, and even more time to begin to move the vast inertia of a basically stopped, slowly rotating 20 barge flotilla.  There was no timely warning by HANNAH or ever any complaint about the LINDSAY ANN's navigation until HANNAH hit LINDSAY ANN's starboard stern from behind at about 1509-20.  The HANNAH never sounded the danger signal on her whistle.

66.     HANNAH interests now incorrectly contend the Belmont Range Crossing Channel- a dredged channel (45 feet deep) for deep draft ocean going ships – is a fairway for shallow draft flotillas.[18]  Even more absurdly, HANNAH interests incorrectly contend HANNAH could only proceed down the five hundred (500 feet) foot wide Belmont Range Crossing

---

[18] *Contra*, NOAA, U.S. Coast Guard Coast Pilot 5, Chapter 8 at page 349, http://www.nauticalcharts.noaa.gov/nsd/coastpilot/files/cp5/CPB5_E43_C08_20150703_1809_WEB.pdf ("The river channel between New Orleans and Baton Rouge is for the most part deep and clear.  However, at low river stages there are sections of the river that have been improved by dredging to accommodate deep-draft vessels.  These sections are called crossings.")

Channel, while failing to mention that at all times it was improperly navigating on the upbound side of the Belmont Crossing and not the downbound side, as its own Rose Point data reflects.  (Marquette Ex. 4).

67.     Even if the deep draft Belmont Range Crossing Channel was a fairway for shallow draft barge flotillas, which it is not; or if HANNAH was a deep draft ship, which she is not — HANNAH then would have been obliged by Inland Rule 9 to keep to her own right side of the Belmont Range Crossing Channel, which objective contemporaneous Rose Point and U.S. Coast Guard VTS AIS evidence show she did not.  (Marquette Ex. 1, 2, 3, 4, & 5).    The centerline of the Belmont Crossing is marked by a visual range, so upbound/northbound deep draft ships keep to their right in the upbound lane, and downbound/ southbound deep draft ships keep to their right in the downbound lane. Instead, HANNAH kept left and traveled southbound/downbound the wrong way in the northbound/upbound lane of the Belmont Crossing Channel.  (*Id.*)

68.     The screen shot from SAFETY RUNNER's Rose Point ECDIS below at 1506-31 confirms the downbound/southbound HANNAH improperly entering the Belmont Crossing northbound lane and even worse, shaping her course (COG dotted line vector) toward LINDSAY ANN's stern outside the Belmont Crossing and not toward the midpoint between LINDSAY ANN and the river bank as HANNAH did when meeting CETUS OCEAN and DENNIS HENDRIX.  (Marquette Ex. 5).  That HANNAH continued improperly keeping to her left side of the 500 foot wide Belmont Crossing is shown by the screen shots at 1507-21 and 1509-04.

**HANNAH  entering left (north bound) lane at 1506-31 (3 minutes before collision)**



**HANNAH  navigating in left (north bound) lane at 1507-21**



**HANNAH navigating in left (north bound) lane shortly before collision at 1509-04**



69.     HANNAH's Captain Dean suggested at deposition that HANNAH was as close to the

west bank as possible.  His incredible testimony is demonstrated by the objective,

contemporaneous Rose Points which show HANNAH was not even as close to her right

side of the deep draft Belmont Crossing channel as she could and should have been

(Marquette Ex. 1, 3, 4 & 5).  Moreover, HANNAH is not a deep draft ship.  Shallow draft

tow flotillas like HANNAH can and do navigate from bank to bank in this area of the river. The Port Vision recordings of the HANNAH flotilla's other southbound/downbound transits of this area in similar river gage conditions show her keeping much closer to the West Bank, and not southbound down the northbound/upbound lane of the Belmont Crossing. (Marquette Ex. 7).

**HANNAH navigating on right shoulder of the Belmont Crossing on July 13, 2013**
**(even closer to the allegedly highly dangerous downriver Barge Fleet)**



70.  As for not being able to "hug" the west bank, the U.S. Coast Guard VTS AIS ECDIS and the SAFETY'S Rose Point electronic chart show in the minutes after impact HANNAH made a quick "U-turn," topping around upriver unassisted and then leaving the Belmont Range Crossing Channel and maneuvering right next to the west bank. (Marquette Ex. 1 & 5). Indeed, a few minutes later HANNAH pushes her flotilla against the West Bank – where she took refuge for the next several hours. After the incident, HANNAH hugged the West Bank. Based on this, and consistent with Capt. Hilton's expert testimony who has navigated this area on enumerable occasions, the Court concludes that HANNAH could have navigated near the West Bank well before the collision.

**USCG AIS data showing the HANNAH approaching the west bank
after the collision at 1521-26**



71.    Had the burdened, give way HANNAH simply shaped her course to pass midway between the LINDSAY ANN flotilla and the river bank- just as she did for the CETUS OCEAN ship and the DENNIS HENDRIX flotilla, this incident could not have happened. Burdened, overtaking HANNAH failed to "keep out of the way" of privileged overtaken LINDSAY ANN, and in particular HANNAH failed her Inland Rule 16 duty to take "early and substantial action to keep <u>well clear</u>" of LINDSAY ANN. (Ivey at 195:18-20). HANNAH close shaving of the LINDSAY ANN's stern at high speed was the cause of this incident.

**CONCLUSIONS OF LAW**

1.    This case arises under the Court's admiralty and maritime jurisdiction. Rule 9(h) of the Federal Rules of Civil Procedure.

2.    The waters involved in this case are governed by the Inland Navigation Rules.  33 C.F.R. 83.01, *et seq.*

## The Overtaking Situation

3.      From 1458 hours (2:58 p.m.) through the collision at about 1509-20 hours (3:09 p.m. and

twenty seconds), the HANNAH flotilla and the LINDSAY ANN flotilla were in an

overtaking situation governed by Inland Rule 13.[19]

4.      Overtaking does not depend on a verbal agreement, but is a situation created by the

relative speeds and positions of the vessels.[20]  In this case, the HANNAH and LINDSAY

ANN agreed to a "one-whistle" overtaking, requiring the burdened, give-way HANNAH

to pass between the starboard (right) side of the privileged, stand-on LINDSAY ANN

flotilla and the west bank of the Mississippi River.[21]

5.      There is no ambiguity in Inland Rule 13(a):

> "Notwithstanding anything contained in Rules 4 through 18, any vessel
> (HANNAH) overtaking any other shall keep out of the way of the vessel
> being overtaken (LINDSAY ANN)."[22]

6.      Once overtaking, always overtaking – any subsequent change in the bearing between the

vessels does not change the overtaking situation into a crossing situation. Once again,

there is no ambiguity in Inland Rule 13(d):

> "Any subsequent alteration of the bearing between the two vessels
> shall not make the overtaking vessel a crossing vessel within the
> meaning of these Rules, or relieve her (HANNAH) of her duty of
> keeping clear of the overtaken vessel (LINDSAY ANN) until she
> (HANNAH) is finally past and clear."[23]

---

[19] 33 C.F.R. § 83.13.

[20] 33 C.F.R. § 83.13.

[21] 33 C.F.R. § 83.34 ("When in sight of one another: (i) a power driven vessel intending to overtake another power driven vessel shall indicate her intention by the following signals on her whistle: one short blast to mean "I intend to overtake you on your starboard side"…").

[22] 33 C.F.R. § 83.13 (parenthetical flotilla names supplied for emphasis).

[23] 33 C.F.R. § 83.13 (parenthetical flotilla names supplied for emphasis).

7.      HANNAH's overriding, mandatory duty to keep clear of the LINDSAY ANN is further

emphasized in Inland Rule 16, Action by Give-Way Vessel:

> "Every vessel which is directed to keep out of the way of another
> vessel shall, insofar as possible, take <u>early</u> and <u>substantial</u> action to
> keep <u>well clear</u>."[24]

8.      When carrying out her duty to keep well clear of the privileged, stand-on LINDSAY

ANN, HANNAH navigators must also be mindful of Inland Rule 7 — Risk of Collision,

and Inland Rule 8 — Action to Avoid Collision.

## Risk of Collision

9.      Inland Rule 7 provides, in pertinent part:

> (a) "Every vessel shall use all available means (visual lookout,
> Rose Point navigation system, radar) appropriate to the prevailing
> circumstances and conditions to determine if risk of collision
> exists. If there is any doubt, such risk shall be deemed to exist.
>
> (b) "Proper use shall be made of radar equipment, including long-
> range scanning to obtain early warning of risk of collision and
> radar plotting or equivalent systematic observation (Rose Point
> navigation system) of detected objects."
>
> (c) "Assumptions shall not be made on the basis of scanty
> information…"
>
> (d) "In determining if risk of collision exists the following
> considerations shall be among those (Rose Point "red flashing"
> icon collision alarm) taken into account:
>
> > (i)     Such risk shall be deemed to exist if the compass bearing of an
> > approaching vessel (LINDSAY ANN being approached) does not
> > appreciably change; and
> >
> > (ii)    Such risk may sometimes exist even when an appreciable bearing
> > change is evident, <u>particularly when (HANNAH is) approaching a</u>

---

[24] 33 C.F.R. § 83.16. (underlined text supplied for emphasis).

very large vessel or a tow when approaching a vessel (LINDSAY ANN) at close range."[25]

**Action to Avoid Collision**

10.   Inland Rule 8, Action to Avoid Collision, provides, in pertinent part:

   (a)   "Any action taken to avoid collision shall, if the circumstances of the case admit, be positive, made in ample time and with due regard to the observance of good seamanship."

   (b)   "Any alteration of course or speed (by HANNAH) to avoid collision shall, if the circumstances of the case admit, be large enough to be readily apparent to another vessel (LINDSAY ANN) observing visually or by radar; a succession of small alterations of course and/or speed should be avoided.

   (c)   "If there is sufficient sea room, alteration of course alone (by HANNAH) may be the most effective action to avoid a close-quarters situation provided that it is made in good time, is substantial, and does not result in another close-quarters situation."

   (d)   "Action taken (by HANNAH) to avoid collision with another vessel (LINDSAY ANN) shall be such as to result in passing at a safe distance. The effectiveness of the action shall be carefully checked (by Rose Point navigation system, radar, etc.) until the other vessel (LINDSAY ANN) is finally past and clear.

   (e)   "If necessary to avoid collision or allow more time to assess the situation, a vessel (HANNAH) shall slacken her speed or take all way off by stopping or reversing her means of propulsion."[26]

11.   To be able to comply with these mandatory Inland Rules, of course, HANNAH first was

required to maintain a proper lookout and to proceed at a safe speed. Reviewing the plain

text of Inland Rule 5 — Look-out, and Inland Rule 6 — Safe Speed, it is evident that

HANNAH did not do so.

---

[25] 33 C.F.R. § 83.07 (parenthetical names and underlined text supplied for emphasis).
[26] 33 C.F.R. § 83.08 (parenthetical navigation system names and underlined text supplied for emphasis).

## Lookout Ahead

12.  Inland Rule 5 provides:

> "Every vessel shall at all times maintain a proper look-out by sight and hearing as well as by all available means appropriate (Rose Point navigation system, radar, etc.) in the prevailing circumstances and conditions so as to make a full appraisal of the situation and of the risk of collision."[27]

13.  The give-way HANNAH, from the very inception of the one-whistle overtaking agreement, failed to shape her course to keep well clear of the stand-on LINDSAY ANN. (Marquette Ex. 1, 3, 4, & 5).  Instead, HANNAH was on a collision course with LINDSAY ANN for most of the approach through the moment of impact. (*Id.*)  HANNAH navigators either did not monitor or chose to ignore their own Rose Point navigation system collision alarm (showing LINDSAY ANN's slow drift to the west bank and constantly flashing red collision alarm).  Either way, HANNAH did not maintain a proper lookout.[28]

## Safe Speed/Outdated Rose Point Chart

14.  Inland Rule 6, Safe Speed, states, in pertinent part:

> "Every vessel shall at all times proceed at a safe speed so that she can take <u>proper and effective action to avoid collision</u> and be stopped within a distance appropriate to the prevailing circumstances and conditions.
>
> In determining a safe speed the following factors shall be among those taken into account:
>
> > (a)    By all vessels:

---

[27] 33 C.F.R. § 83.05 (parenthetical names supplied for emphasis).
[28] Lookout Astern – whether LINDSAY ANN should have had a dedicated lookout astern – is discussed later at page 39  (*Ellis* case).

(iii) the <u>maneuverability</u> of the vessel with special reference to <u>stopping distance</u> and <u>turning ability</u> in the prevailing conditions;

(v) The state of wind, sea, and <u>current</u> and the proximity of navigational hazards;

(vi) The <u>draft</u> in relation to the available depth of water."[29]

15.   In this case, at all pertinent times, the LINDSAY ANN was almost stationary, slowly drifting, as is usual and customary for a large downbound line boat flotilla holding up in the Mississippi River.  (Hilton at 2).  Her slow drift was downriver and toward the west bank, and readily apparent on HANNAH's own Rose Point navigation system. (Marquette Ex. 4).  In essence, at all relevant times the LINDSAY ANN flotilla was a "sitting" or "slowly drifting" duck.

16.   In contrast, despite HANNAH Capt. Dean's alleged fears from about 1500 hours onward that HANNAH could not maneuver farther toward the west bank and was already steering as much to starboard as she could and as she dared, due to alleged underwater obstacles along the west bank that restricted the 15 foot shallow draft HANNAH from proceeding any closer to the west bank, HANNAH nevertheless proceeded at full ahead speed.  (Marquette Ex. 1, 2, 3, & 5).

17.   Had HANNAH's Rose Point properly shown the correct location of the Belmont Crossing — Capt. Dean would have known HANNAH was not keeping to her right side edge of the deep draft Belmont Crossing, or as close to the west bank as she should, but in fact was proceeding improperly shaped much too close to the LINDSAY ANN flotilla. At his deposition Capt. Dean did not even realize HANNAH's Rose Point was out of

---

[29] 33 C.F.R. § 83.06 (underlined text supplied for emphasis).

date.  (Marquette Ex. 4).  HANNAH's out of date Rose Point chart was an unseaworthy condition that contributed to this collision.[30]

18.     HANNAH knew or should have known about LINDSAY ANN's slow drift downriver and towards the west bank, and that HANNAH's own Rose Point navigation system was constantly flashing the red collision alarm (alerting HANNAH navigators to the impending collision with LINDSAY ANN), yet HANNAH maintained full speed ahead, which was negligent under the circumstances.  (Marquette Ex. 1, 3, 4, & 5).

19.     If HANNAH had shaped her course to proceed downriver along the same track that upbound DENNIS HENDRIX (a 35 loaded barge flotilla) had followed, between the west bank edge of the Belmont Range and the west bank, then HANNAH full speed ahead might be excusable, but not when proceeding into an allegedly uncertain situation and certainly not when HANNAH was shaping her course, at best, to close shave the LINDSAY ANN flotilla's stern, and, at worst, on a direct collision course with the LINDSAY ANN flotilla and SAFETY GLORY.  (Marquette Ex. 1, 3, 4, & 5).

## Case Law

20.     Having reviewed the overtaking cases cited by both parties, the Court finds this collision situation most closely resembles two cases.  In *Elmini Lama, Inc. v. Tug Natalie Eymard*, in which the overtaking vessel MINI LAMA (like HANNAH) was found solely at fault for colliding with the slower, overtaken tug NATALIE EYMARD.[31]  The Court specifically noted that, "the overtaking vessel (HANNAH) must give the one ahead such

---

[30] *In re T.T. Boat Corp.*, 1999 WL 223165; 1999 AMC 2776, 2783-83, 2786 (E.D.La. 1999); *Traylor Bros., Inc. v. Tug ROBERT GREENE*, 1986 WL 12229, *4 (E.D.La. 1986); *De Bardeleben Marine Corp. v. U.S.*, 451 F.2d 140, 148-149 (5th Cir. 1971)(out of date chart is an unseaworthy condition).
[31] *Elmini Lama, Inc. v. Tug Natalie Eymard*, 567 F. Supp. 438 (E.D. La. 1983) (hereinafter "NATALIE").

a wide berth as to avoid <u>any contingencies</u> that might arise such as sheering by the vessel (LINDSAY ANN) caused by suction, <u>current</u>, or tide."[32]

21.    Here, all were aware, or should have been aware, that the privileged, stand-on LINDSAY ANN flotilla, when holding up for the burdened, give-way HANNAH, would and did drift a relatively short distance during the overtaking due to the current. (Marquette Ex. 1, 3, 4, & 5).  HANNAH should have, and could have, allowed for that drift, as even at the time of collision there was more than 1100 feet of open water available for HANNAH to navigate between the LINDSAY ANN flotilla and the west bank. (*Id.*)  Had HANNAH simply kept well clear as she was obliged to do and shaped her course about 500 feet off the west bank, as she did while passing the CETUS OCEAN before the collision, and as she did within a few minutes after the collision, the collision would not and could not have occurred.[33] (Marquette Ex. 1).

22.    In *NATALIE*, the collision happened where the Mississippi River was a half mile wide (about 2600 feet wide).  The slower, overtaken vessel was on a straightaway  course down the river's middle, which afforded the overtaking vessel (like HANNAH) nearly a quarter mile (1300 feet) to pass the overtaken vessel (like LINDSAY ANN).  As here, the overtaking vessel's navigator apparently lost situational awareness, and stopped studying and checking the effectiveness of his passing course, and ended up just a few feet away from the overtaken vessel. (Marquette Ex. 1, 3, 4, & 5).

---

[32] *Id.* at 440, citing *Bockenheim Unterweser Reedereibeteiligungs Schiffahrtsges, MBH v. M/V Voyager*, 495 F. Supp. 521, 525 (E.D. La. 1980) (underlines supplied for emphasis)  (NATALIE was decided under old Inland Navigation Rule 33 U.S.C. §209 – overtaking vessel to keep out of the way, which is the same as present Inland Rule 13(a)).

[33] *See NATALIE*, *supra* at 439 ("The MINI LAMA's (HANNAH) failure to stay out of the NATALIE EYMARD's (LINDSAY ANN's) way was the sole proximate cause of the vessel's collision")(parenthetical vessel names supplied for emphasis).

23.     In *NATALIE*, the overtaken vessel was proceeding downriver at five miles per hour. Here, of course, the LINDSAY ANN flotilla was essentially stationary. (Marquette Ex. 1). There is no significant difference between what her position would have been based on her drift alone, or her position after she began to top around at about 1508-30 after being released by HANNAH. This is not a case such as those cited by HANNAH interests where the overtaken vessel suddenly and unexpectedly turned or sheered hundreds or thousands of feet toward an overtaking vessel that otherwise was keeping well clear.

24.     Here, as in *NATALIE*, the collision happened because the overtaking HANNAH did not achieve and maintain a safe passing distance, but instead "proceeded at full speed perilously close" to the LINDSAY ANN, even though the Mississippi River provided plenty of room for a successful passing.[34]

25.     Another very similar Mississippi River case assigning sole fault to the downbound overtaking vessel and exonerating the overtaken vessel is *Alter Barge Line, Inc. v. TPC Transp. Co.* In *Alter*, pursuant to an agreement reached via VHF radio contact, the overtaking vessel had planned to shape a midriver course and to come by the overtaken vessel on her port side, "leaving seventeen hundred feet between the two vessels."[35]  At that time, the overtaken flotilla's bow was about 50 feet and the flotilla stern was about 300 feet from the right descending bank shoreline.[36]  The overtaken flotilla, like LINDSAY ANN, agreed to hold her position while the overtaking vessel passed as

---

[34] *See NATALIE*, *supra* at 440.
[35] *Alter Barge Line, Inc. v. TPC Transp. Co.*, 801 F.2d 1026, 1027 (8th Cir. 1986)(while not expressly stated, if the overtaking flotilla's intended midriver course would allow 1700 feet clearance between the flotillas, the Mississippi River must be about 3,000 feet wide at Mississippi River Mile 943 below Cairo, Illinois, where the collision happened).
[36] *Id.* at 1027.

quickly as possible. The overtaken vessel could not remain exactly in one spot due to the river current, but while holding up she drifted and maneuvered about 500 feet closer to the overtaking vessel's course.[37]   The overtaking flotilla (like HANNAH) did not shape her course to keep well clear and steered quite close to where the overtaken flotilla was drifting and maneuvering while holding up.  The Court determined that the collision between the overtaking flotilla's bow and the overtaken flotilla's stern "occurred eight hundred feet from the right descending bank."[38]

26.  The Court in *Alter* held that the "direct and proximate cause of the collision was the failure of [the overtaking vessel] to give a wide berth as she passed the [overtaken vessel's] position," thereby breaching her statutory duty to keep out of the way.[39] Furthermore, the position of the overtaken vessel was not found to be a contributing factor to the accident. The Court noted that, "even at 800 feet from the right descending shore, the [overtaken vessel's] stern was still well away from either the [overtaking vessel's] desired course or the channel," and "as such, the [overtaking vessel] was solely at fault for the collision."[40]

27.  In *Alter*, the overtaking flotilla that came into collision despite 1200 feet of open water off the overtaken flotilla's stern was found sole fault.  That the overtaken flotilla drifted and maneuvered at least 500 feet toward the overtaking flotilla's intended course while holding up was not a fault  or a violation of the hold up agreement. Here, similarly,

---

[37] *Id.* at 1027-1028 (while holding up, the overtaken flotilla stern moved from 300 feet off the shore at initial hold up to 800 feet off the shore at collision, 800 – 300 = 500 feet movement across the river and toward the overtaking vessel's course.  This still left about 1200 feet of open water between the overtaken flotilla's stern and where the overtaking flotilla could and should have proceeded.)
[38] *Id.* at 1028.
[39] *Id.*
[40] *Id.*

HANNAH had more than 1100 feet of open water from overtaken LINDSAY ANN's stern to the west bank. (Marquette Ex. 1, 3, 4, & 5).

28.     The Court also finds significant the Fifth Circuit case *Ellis Towing & Transp. Co. v. Socony Mobil Oil Co.*[41] In *Ellis*, the Fifth Circuit held the overtaking vessel, SACONNET, solely at fault because she ran "too fast and too close to the overtaken tow and tug."[42] Just as here, the overtaking vessel in *Ellis* claimed she had to navigate in the middle of the waterway, close to the overtaken flotilla due to "anticipated shoaling" on the starboard side of the waterway.[43]  Due to wind affecting the flotilla, the overtaken flotilla could not and did not proceed straight down the waterway, but began angling toward the course of the overtaken vessel, all in plain view of the overtaking vessel.[44]

29.     The overtaking vessel in *Ellis* pressed on at a speed of 7.3 knots (about 8.3 miles per hour – slower than the HANNAH), her course now shaped to pass only 75-100 feet from the flotilla, and as a result the tug capsized and sank.[45]

30.     The Fifth Circuit overruled the District Court's decision that had assigned equal fault to both vessels and found the overtaking vessel solely at fault because the overtaking vessel shaped her course too close (75-100 feet) to the overtaken flotilla, when the overtaking vessel, whose draft was about 30 feet, had some 370-380 feet of 30 foot deep water between the flotilla and the edge of the waterway.[46]

---

[41] *Ellis Towing & Transp. Co. v. Socony Mobil Oil Co.*, 292 F.2d 91 (5th Cir. 1961).
[42] *Id*. at 94.
[43] *Id*. at 93.
[44] *Id*.
[45] *Id*.
[46] *Id*. at 94.

31.     Here, of course, the HANNAH had more than 1100 feet of navigable water to her starboard side toward the west bank. (Marquette Ex. 1, 3, 4, & 5).  Had HANNAH just split the difference and navigated 500-600 feet off the west bank, the collision could not have happened. As stated by the Fifth Circuit, "there was thus no need (for HANNAH) to shave by (LINDSAY ANN) at 75 to 100 feet."[47]

### Lookout Astern

32.     In *Ellis*, as here, the overtaking vessel urged the Court to find fault on the part of the overtaken vessel, urging an inadequate lookout astern.[48] The Fifth Circuit made short work of that argument.  While noting there might be a burden on an overtaken vessel to keep a dedicated lookout astern and to warn the overtaking vessel of a situation "arising subsequent the mutual assent and of which the overtaking vessel might not have the means of knowledge," the Fifth Circuit stated absent such circumstances:

> "there is no duty on an overtaken vessel to keep a lookout astern to see whether the overtaking (HANNAH) is complying with her mandatory duty to keep clear."[49]

33.     Here, all were aware LINDSAY ANN when holding up would be and was subject to drift. (Dean 229:10-17; Ivey 184:22-185:15; Clark 114:7-19).   LINDSAY ANN's increasing drift was readily apparent on HANNAH's own Rose Point, not to mention by HANNAH's Captain Dean simply looking forward visually. (Marquette Ex. 3).  When LINDSAY ANN was released at 1507-21 by HANNAH, LINDSAY ANN could begin to top around at her discretion.  To top around LINDSAY ANN would stop operating her engines astern, and put them to full ahead, which would generate substantial wheel wash

---

[47] *Id.*
[48] *Id.* at 95- 96.
[49] *Id.* at 95.

astern -- readily visible to HANNAH if they were monitoring LINDSAY ANN as they

should.  Likewise, LINDSAY ANN topping around would be and was readily apparent

on HANNAH's own Rose Point -- yet HANNAH's captain did not protest or give any

timely warning. (Marquette Ex. 3).

34.     The Fifth Circuit in *Ellis* noted:

> "Moreover, as with any lookout, the question would exist whether
> such a lookout would have served any purpose.  A ship may be
> negligent for failure to have a proper vigilant lookout, and yet not
> be held at fault where, for example, what the lookout would have
> learned was already known."[50]

> \*       \*       \*       \*       \*

> "The question itself is an awkward one for the (HANNAH), for the
> lookout to be fruitful, the contention must assume that had
> (LINDSAY ANN) looked, he would have seen two things.
> (LINDSAY ANN) would have seen, first, an evident dereliction on
> the part of the (HANNAH) either in speed, position, or both.
> Second, he would have seen that such violations were so patent
> and so far advanced that unless (LINDSAY ANN) took evasive
> actions serious harm would be done to (LINDSAY ANN) or
> (HANNAH) or both."[51]

35.     Here, of course, up until 1507-21 there is no question LINDSAY ANN did see

HANNAH approach, and while HANNAH had not yet taken proper action to keep well

clear, there was still time and distance available for HANNAH to do so.  All HANNAH

had to do to get to her right hand edge of the Belmont Crossing channel, or further, was

turn to her starboard at the rate of twenty degrees/minute, for one or two minutes, the

same turn rate as she had done while rounding College Point and meeting the DENNIS

---

[50] *Id.* at 96.
[51] *Id.*

HENDRIX at 1458-1500, and just as she did in the few minutes after the collision. (Marquette Ex. 1).

36.   LINDSAY ANN's Capt. Clark testified he saw HANNAH begin to change her heading and her COG vector to starboard, thus when HANNAH released LINDSAY ANN from holding up at 1507-21, LINDSAY ANN could safely begin to top around. (Clark 112:3-8).  By then, LINDSAY ANN was drifting at a slow but ever increasing rate toward the west bank despite LINDSAY ANN backing full and her flanking rudders hard over. (Marquette Ex. 1, 3, 4, & 5).

37.   Studying LINDSAY ANN's and HANNAH's COG vectors showing LINDSAY ANN drift between 1506-1507, and between 1507-1508, it is evident collision likely would have happened anyway even if LINDSAY ANN had not started to top around. (Marquette Ex. 1, 3, 4, & 5).

38.   Due to HANNAH's failure to keep well clear after 1507-21 there was an extreme risk of collision which HANNAH did not appreciate and did not take proper action to avoid.  In fact, between 1508-20 and 1508-40 HANNAH stopped steering to starboard, checked her starboard swing and turned to port, toward LINDSAY ANN.  HANNAH also did so before collision between 1509-00 and 1509-15.

39.   In particular, the U.S. Coast Guard VTS AIS shows that from 1506:00 until 1508:20 HANNAH's COG vector came to starboard almost 7 degrees.  It was this starboard swing that encouraged Capt. Clark to think HANNAH was finally starting to maneuver clear.

40.   But then, from 1508:20 to 1508:40, HANNAH checks her starboard swing and turns to port from 51.8 degrees to 51.3 degrees.

41.     HANNAH then starts to turn to starboard again, but stops at 53 degrees at 1509:00, and begins to turn back to port again, to 51.7 degrees by 1509:15.

42.     In such circumstances, the Fifth Circuit's words are particularly compelling:

> "(HANNAH) must at least point to facts demonstrating that the (LINDSAY ANN) on looking would have learned what (HANNAH) continues to deny – that (HANNAH) was bent on reckless navigation almost certain to do harm unless the victim took action."[52]

43.     There is no way LINDSAY ANN could have anticipated that HANNAH would not steer substantially to starboard after releasing LINDSAY ANN at 1507-21, but instead would recklessly try to close shave LINDSAY ANN by 75-100 feet- when HANNAH had more than 1100 feet of open, navigable water to her starboard.

44.     HANNAH never timely signaled to LINDSAY ANN by whistle or by VHF radio that HANNAH would not be able to keep well clear of LINDSAY ANN.  To the contrary, between 1507-21 and 1507-30 HANNAH released LINDSAY ANN, and expressed appreciation for LINDSAY ANN's navigation. (Marquette Ex. 1).

45.     At that time, HANNAH was on a collision course with LINDSAY ANN, and HANNAH's own Rose Point was flashing a red collision alarm. (Marquette Ex. 4) This situation continued because HANNAH did not turn sufficiently to starboard, but at about 1508-20 checked her starboard swing and actually turned to port. (Marquette Ex. 1).

---

[52] *Id.*

46.     When an overtaking vessel, without proper signals, comes so close to the overtaken vessel that a sudden change in course by the latter may bring about a collision, the fault is that of the overtaking vessel.[53]

47.     The quibbling between the navigation consultants whether or not LINDSAY ANN by topping around less than a minute before impact resulted in her stern at collision being practically in the same place (LINDSAY ANN consultant) or 100 feet closer to the west bank than by drift alone (HANNAH consultants) is not necessary or helpful to resolution of this issue. The law does not cut so fine, especially when there was 1100 feet of navigable water available to HANNAH between LINDSAY ANN's stern at collision and the west bank. (Marquette Ex. 1).

48.     If an overtaking vessel like HANNAH approaches and attempts to pass at close proximity to an overtaken vessel like LINDSAY ANN, the overtaking vessel assumes the risk of collision.[54]

### **HANNAH Case law**

49.     HANNAH's argument that at least some fault (25%) should be allocated to LINDSAY ANN seems to be based on the case *Complaint of B.F.T. No. Two Corp.*[55]

50.     In *B.F.T.*, an overtaken tug/barge flotilla had stopped and was shortening up while her tow was drifting by wind and current toward a dredged channel range where the overtaking deep draft ship claimed it had to navigate.[56]

---

[53] *Id.; The GEORGIA*, 18 F.2d 743 (2d Cir. 1927).

[54] *Alter, supra*.  See also *Liner v. CREWBOAT MR. LUCKY*, 275 F.Supp. 230, 234 (E.D.La. 1967)("MR. LUCKY").

[55] *Complaint of B.F.T. No. Two Corp.*, 433 F.Supp. 854 (E.D. Penn. 1977)("B.F.T.")(75% liability to overtaking vessel (HANNAH); 25% liability to overtaken vessel that allegedly drifted three miles in 25 minutes before the collision.  *Id.* at 861).

[56] *Id.* at 859-860.

51. Several minutes before collision, the overtaking vessel's pilot noted his ship's course would take her within 300 feet of the drifting tug's stern, so he altered course a little bit to allow for 500 feet passing clearance between herself and the tug.[57]

52. Despite this course change, there was collision, and, as here, the overtaking ship alleged the overtaken, drifting tug flotilla was sole fault.[58]

53. The Court disagreed and strongly criticized the ship for not keeping well clear and for choosing to shape her course to pass only 500 feet astern of the tug when the ship in fact had miles of navigable water to the side in which to circumvent the tug.[59]   The Court found as a contributing cause to the overtaking ship trying to pass so close was the overtaking ship did not maintain a proper radar lookout.[60]   Accordingly, the Court assigned 75% fault to the overtaking vessel (HANNAH).[61]

54. The Court did criticize the overtaken vessel, but tempered its criticism, stating:

> Furthermore, the cases which have found a violation of the overtaken vessel's duty involve a violent or sudden change of course by the overtaken vessel.  (cites omitted).  In this case there is not and could not be an allegation that the tug suddenly altered its course or veered in front of the bow of the overtaking vessel. The tug had been drifting slowly toward the southwest for approximately 20 minutes…[62]

---

[57] *Id.* at 860.
[58] *Id.* at 858.
[59] *Id.* at 869.
[60] *Id.* at 870-871.
[61] *Id.* at 875-876 (parenthetical name supplied for emphasis).
[62] *Id.* at 868.

55.     The Court expressly noted that drifting tow flotillas cannot be moved quickly, so warning signals or radio calls would need to be made by the overtaking vessel when the overtaking vessel was far distant.[63]

56.     The tug flotilla was criticized for not maintaining a lookout astern in unfamiliar waters at night, which might have prevented the flotilla from drifting so far, and the accident then probably could have been avoided.[64]

57.     Here, of course, LINDSAY ANN's captain was quite familiar with the Belmont Crossing area.   Likewise, LINDSAY ANN drifted and then started topping, moving only a few hundred feet, not several miles. (Marquette Ex. 1, 3, 4, & 5).   Independent witness Capt. Ivey testified there was nothing unusual about LINDSAY ANN's location at the time of the collision. (Ivey 201:9-15).   The only thing unusual was the HANNAH flotilla approaching so close to LINDSAY ANN. (*Id.*).

58.     Accordingly, *B.F.T.* is distinguishable from the case at hand, and does not support a finding of liability against LINDSAY ANN, but does support a finding of sole fault liability against HANNAH.

59.     HANNAH also cites several other overtaking cases in support of its argument that overtaken LINDSAY ANN be found sole fault, or principally at fault.   These cases are distinguishable and inapposite to the facts at hand.

60.     *Williams-McWilliams Industries Inc. v. F & S Boat Corp.*, is not a Mississippi River case, but involves a not yet overtaken tug/barge flotilla that negligently ran aground in a 200

---

[63] *Id.* at 871.
[64] *Id*. at 864-866.

foot wide canal off the Atchafalaya River.[65]  The overtaking vessel was able to back and

to stop and nose into the bank about 1000 feet distant and well clear from the grounded

tug/barge flotilla.[66]  A barge then broke loose from the grounded, never overtaken flotilla

and drifted back 1000 feet into collision with the stationary, never overtaking flotilla

nosed into the bank.[67]

61.    The Court noted that overtaking vessels assume the risks inherent on passing, and are

obliged to guard against foreseeable and normal maneuvers of the slower, overtaken

vessel.   But the overtaking vessel did not assume the risk of the overtaken flotilla

grounding, the tow breaking apart, and a loose barge drifting 1000 feet and striking the

stationary overtaking flotilla.[68]   These are not the facts of the HANNAH/LINDSAY

ANN collision.

62.    *Navegacion Castro Riva v. The M/C NORDHOLM* is a case involving two vessels

overtaking, the overtaking vessel properly shaping her course to pass well clear of the

overtaken vessel with a lateral distance of 1000 feet between them during the

overtaking.[69]   The Mississippi River at the place of overtaking was about 2100 feet

wide.[70]

63.    The overtaken vessel was proceeding upriver about 300-400 feet off the east bank at a

speed of 7 knots.[71]  The overtaking vessel was about midriver, proceeding at a speed of

---

[65]*Williams-McWilliams Industries Inc. v. F & S Boat Corp.,* 286 F.Supp. 638, 641 (E.D.La. 1968).
[66] Id. at 640.
[67] Id. at 640-641.
[68] *Id*. at 642.  (citing *Navegacion Castro Riva v. The M/C NORDHOLM*, 178 F.Supp. 736 (E.D.La. 1959).
[69] *Navegacion Castro Riva v. The M/C NORDHOLM*, 178 F.Supp. 736, 737 (E.D.La. 1959).
[70] *Id*. at 742, note 3.
[71] *Id*. at 737.

13 knots.[72]  Suddenly, as the vessels were rounding Bolivar Point almost overlapping, the overtaken vessel took a quick sheer to port and came half way across the Mississippi River, about 1100 feet, into collision with the overtaking vessel about 700 feet off the west bank.[73]

64.    The Court found the overtaken vessel sole fault because the overtaking vessel had kept well clear (1000 feet) of the overtaken vessel and there was plenty of room for a safe overtaking.[74]  Also, the overtaken vessel was old, unseaworthy and too underpowered to control herself.[75]

65.    Of course, if the HANNAH flotilla similarly had kept well clear and had shaped to pass with 1000 feet lateral separation from the LINDSAY ANN flotilla, the HANNAH/LINDSAY ANN collision would not have happened.  LINDSAY ANN did not suddenly sheer half way across the Mississippi River.  She just slowly drifted toward the west bank while holding up and then when she started to top around.  LINDSAY ANN's slow drift was foreseeable and normal.

66.    The facts of the NORDHOLM do not justify a finding of any liability on LINDSAY ANN – the facts are completely different.

**Belmont Crossing**

67.    The Belmont Range Crossing is <u>not</u> a fairway for the safety of shallow draft towboat and line boat flotillas on the Mississippi River.  The Court takes judicial notice of the Official

---

[72] *Id.*
[73] *Id.* at 738.
[74] *Id.* at 740.
[75] *Id.* at 739.

U.S. Government publication "U.S. Coast Pilot, Volume 5, Chapter 8 which at page 349 states:

> "Above New Orleans, the Mississippi River is used by <u>oceangoing vessels</u> to Baton Rouge, about 135 miles above Canal Street.
>
> **<u>Channels</u>**
>
> The river channel between New Orleans and Baton Rouge is for the most part deep and clear.  However, at low river stages there are sections of the river that have been improved by dredging to accommodate <u>deep draft</u> vessels.   These sections are called crossings.  Mississippi River crossings number 13 in all and are at:
>
> Belmont, Lower, 152.3 AHP (other listed crossings omitted for brevity)
>
> Federal Project depth for crossings is 45 feet to mile 181 AHP…in 1980 the U.S. Army Corps of Engineers reported that the Lower Belmont Crossing is maintained yearly.  Lighted ranges mark the centerline of the channel at the crossings.
>
> River gages are maintained at New Orleans (Carrollton) 102.8 miles AHP…Reserve, 138.7 miles AHP; Donaldsonville, 175.4 miles AHP."[76]

68.     The Court also takes judicial notice of the U.S. Army Corps of Engineers records reported by the New Orleans Board of Trade showing that on Saturday, 22 February 2014 the New Orleans (Carrollton) gage was at 7.0 feet, the Reserve gage was 10.41 feet, and the Donaldsonville gage was 14.26 feet.

69.     Thus, to the charted depths printed on Official U.S. Government (NOAA) Nautical Chart 11370 – Mississippi River New Orleans to Baton Rouge, in way of the Belmont Crossing between Reserve and Donaldsonville, one must add at least 10 feet.  The river was at least 10 feet deeper on the day of the collision than is printed on the pertinent navigation

---

[76] U.S. Coast Pilot, Volume 5 (U.S. Gulf Coast), Chapter 8, page 349.

chart – and thus was navigable virtually from bank to bank for flotillas of HANNAH's and LINDSAY ANN's draft.

70.   On Nautical Chart 11370 the Belmont Range is printed and labeled as a "crossing," not as a fairway.  In comparison, on U.S. Government Nautical Chart 11361 in the southwest corner there are waterways printed and labeled as "Fairway Anchorage" and "Safety Fairway."  There is no authority or publication stating the Belmont Crossing is a fairway. Accordingly, the Court disagrees with HANNAH that the Belmont Crossing is a fairway.

71.   Likewise, the Belmont Crossing is not a "narrow channel" for shallow draft flotillas like HANNAH and LINDSAY ANN that can navigate virtually the entire 3000 feet wide "bank to bank" distance of the Mississippi River where the collision happened.[77]

72.   Moreover, a dredged, deep draft crossing is not akin to a highway for cars.  There is no rule of law which limits the navigation of a vessel to a ship channel, as a land vehicle such as an automobile would be limited to operation on a highway.  The vessel may navigate at any part of a river containing navigable water.[78]

73.   Accordingly, in this situation HANNAH should have been proceeding downriver between the Belmont Crossing and the west bank, about 500 feet off the riverbank – just as she did when meeting the CETUS OCEAN at about 1441 hours, and just as she did in the minutes after the collision with LINDSAY ANN. (Marquette Ex. 1), and/or at a bare

---

[77] *Marine Transport Lines, Inc. v. M/V TAKO INVADER*, 37 F.3d 1138, 1142-43  (5th Cir. 1994)(on remand 1200 foot wide section of Mississippi River not a Narrow Channel); *St. Phillip Offshore Towing Co., Inc. v. Wisconsin Barge*, 466 F.Supp. 403, 407, 410 (E.D.La. 1979)(2000 foot wide section of Mississippi River not a Narrow Channel).

[78] *American Dredging Co. v. Calmar Steamship Co.*, 121 F.Supp. 255, 263 (E.D.Pa. 1954), *aff'd* 218 F.2d 823 (3d Cir. 1955); see also *Marine Transport Lines, Inc. v. M/V TAKO INVADER*, 37 F.3d 1138, 1144  (5th Cir. 1994). The objective, independent evidence shows there was adequate deep water for HANNAH to have kept well clear, 500-600 feet off the west bank.

minimum on its side (downbound not upbound) of the Belmont Crossing.  Had HANNAH done so, as she was required to do, the collision could not and would not have happened.

### *In Extremis*

74.    LINDSAY ANN, as the privileged, "stand-on" vessel, was entitled to rely upon her agreement with HANNAH that HANNAH would keep well and clear of the LINDSAY ANN. HANNAH could and should have shaped her own course to pass midway between LINDSAY ANN and the west bank, but instead, HANNAH shaped her course to collide with LINDSAY ANN from 1502 hours onwards. (Marquette Ex. 1, 3, 4, & 5).

75.    Even as late as 1507-21 there was still ample time and distance for the maneuverable HANNAH flotilla to make a proper, substantial change of course to starboard and shape her course toward the west bank, as HANNAH in fact did in the two to three minutes *after* the collision. (Marquette Ex. 1, 2, 3, & 5).  HANNAH, however, did not take proper, timely action to keep clear of the LINDSAY ANN. Because the much longer and less maneuverable LINDSAY ANN flotilla was almost stationary against the strong current, slowly drifting toward the west bank despite backing down and using her flanking rudders, there was nothing more that LINDSAY ANN could do to take meaningful collision avoidance action when HANNAH, at about 1508-30 to 1509 hours, reached the point where collision could no longer be avoided by HANNAH action alone, and Inland Rule 17(c) required LINDSAY ANN to take action. Moreover, Inland Rule 17(d) emphasizes that any action taken by the stand-on LINDSAY ANN under the rule

does not relieve the give-way HANNAH of her obligation to keep out of the way of LINDSAY ANN.

76.     LINDSAY ANN was placed in extremis by HANNAH's failure to honor the overtaking agreement and to keep well clear of LINDSAY ANN as set forth in Inland Rules 13 and 16. That LINDSAY ANN's captain was not able to maneuver LINDSAY ANN clear in the twenty seconds after HANNAH's captain, at 1509 hours, stated on VHF radio that it looked as though the vessels would collide does not visit fault upon LINDSAY ANN under the circumstances of this case. (Marquette Ex. 1).

77.     HANNAH's claim that HANNAH, pushing two barges at full speed ahead, was placed in extremis by a nearly stationary, slowly drifting twenty barge line boat flotilla in the middle of the Mississippi River, whose drift toward the west bank could be observed on HANNAH's own Rose Point navigation system, which HANNAH's captain Dean apparently chose to ignore, is unavailing.

78.     The *In Extremis* doctrine does not excuse HANNAH for her improper maneuvers and failure to keep well clear of the LINDSAY ANN flotilla where the imminence of the peril was occasioned by the fault of HANNAH's navigator. This is particularly so when the peril could have been avoided by earlier precautions, which the give-way HANNAH was bound to take.[79]

---

[79] *Michigan Bell Tel. Co. v. Copper Range R. Co.*, 355 F.2d 678, 683 (6th Cir. 1966); *City of Chicago v. M/V Morgan*, 375 F.3d 563 (7th Cir. 2004).

79.     Simply put, HANNAH proceeding into a position of danger without attempting to avoid or to prevent the situation denies HANNAH the benefits of the *In Extremis* doctrine. The danger was one which HANNAH materially created.[80]

80.     HANNAH was unseaworthy, based upon the insufficiency of her crew and appurtenances, and the lack of a proper electronic display navigation chart. (Marquette Ex. 4).

81.     LINDSEY ANN was entitled to rely on the HANNAH to keep well clear in compliance with the overtaking agreement under the U.S. Inland Navigation Rules.[81]

82.     "Masters are bound to obey the Rules and entitled to rely on the assumption that they will be obeyed."[82]

83.     The *Pennsylvania Rule* applies to HANNAH due to its violations of the Inland Navigational Rules and/or any other applicable law, statute, or regulation.

## Navigation Experts

84.     HANNAH interests proffered navigation expert Tim Anselmi to bolster their case and to criticize LINDSAY ANN's movements in the last minute before collision.  In contrast, Marquette proffered Capt. Hilton to testify regarding his navigation experience and the facts and circumstances of the collision. The Court notes that in *China Union Lines, Ltd. v. A.O. Anderson & Co.* the court set forth guidance on such testimony:

> The piercing searchlight of hindsight…may point to other maneuvers that might have been taken (by LINDSAY

---

[80] *Michigan*, *supra*, ("A party cannot claim the benefit of the in extremis rule when the emergency is one which the party helped materially create"); *See also*, *Tassinari v. Key W. Water Tours, L.C.*, 2007 WL 1760923, *2 (S.D. Fla. June 18, 2007).

[81] *Zim Israel Navigation Co., Ltd. v. Special Carriers*, 611 F.Supp. 581, 589 (E.D.La. 1985)(stand-on vessel entitled to assume the give-way vessel would obey rules and keep clear).

[82] *Gulf & American Steamship Co., Inc.*, 1975 AMC 1331, 1336 (E.D.La. 1970).

ANN)…However, both we and the [trial] judge must interpret the record from the viewpoint of a prudent pilot under the circumstances there and then existing…Conduct must be judged with reference to the circumstances at the time and not by a cool estimate of possible danger which might be formed after the event.[83]

85.   Having considered the testimony of expert Anselmi and Capt. Hilton, the Court finds that Capt. Hilton's testimony was credible and very helpful to the Court based upon his significant experience in navigating similar vessels through College Point in the Mississippi River, while as his resume and testimony reflected, Anselmi lacked any such true significant navigational experience.

86.   HANNAH's proffered expert Tim Anselmi assisted by HANNAH counsel Jones Walker's employee Frank Hutchinson have proffered a computer animation using Adobe Flash Professional to conclude that LINDSAY ANN's captain should have divined from the outset that after 1507:30 the HANNAH flotilla would not follow the requirements of the Inland Navigation Rules and keep well clear of LINDSAY ANN.

87.   Back in the real world, the Court finds that LINDSAY ANN's captain in the 60-90 seconds before collision could not possibly know that HANNAH would not turn right to keep well clear as Rules 13 and 16 require, but instead would stop HANNAH's starboard swing and steer back to port, toward LINDSAY ANN, at 1508-20.

88.   Because HANNAH captain chose not to communicate his intentions or any alleged concerns about LINDSAY ANN's maneuvers, LINDSAY ANN's captain as a prudent mariner relied upon the expectation that burdened, give-way HANNAH would honor the Navigation Rules.

---

[83] *China Union Lines, Ltd. v. A.O. Anderson & Co.*, 364 F.2d 769, 779 (5th Cir. 1966).

**Rule 17 Analysis**

89.     Having determined that HANNAH violations of Inland Rules 13 and 16 in failing to keep well clear of LINDSAY ANN were the principal cause of the collision, the Court now looks to see whether LINDSAY ANN violated Inland Rule 17.[84]  If not, HANNAH is at sole fault for this collision.

90.     As HANNAH was obliged to keep out of the way, LINDSAY ANN, the stand-on vessel, was expected under Inland Rule 17(a)(i) to keep her course and speed – subject to the usual and customary contingencies and conditions such as the LINDSAY ANN tow flotilla drifting or maneuvering a relatively short distance, while holding up – but always leaving ample clear water for the overtaking vessel to get by while keeping well clear. This arrangement allows each vessel's navigator to know precisely what he can expect from the other.  The "give-way" vessel (HANNAH) is thus relieved of the concern that his early avoiding action might be cancelled by the "stand-on" vessel's avoiding maneuver.

91.     Here, HANNAH could have and should have taken early avoiding action from 1502 through 1507-21 to keep well clear of LINDSAY ANN, but did not.  Had HANNAH done so, and properly been proceeding about 600 feet off the west bank, the 1507-21 to 1507-30 VHF radio communication significance would be moot.

92.     From 1502 through 1507-21, until about two minutes before collision, LINDSAY ANN was properly maneuvering for the overtaking, backing down full astern or nearly so at all

---

[84] The Court also finds HANNAH violated inland Rule 5 – lookout; Inland Rule 6 – safe speed; Inland Rule 7 – ascertaining risk of collision; Inland Rule 8 – action to avoid collision; and Inland Rule 34(d) – danger signal. These violations led to and contributed to the principal collision cause, HANNAH violations of Inland Rule 13 – overtaking and Inland Rule 16 – action by give-way vessel.

times.   Also her captain was using her flanking rudders to hold the slowly drifting LINDSAY ANN flotilla off the west bank as much as possible to give HANNAH room to get past while keeping well clear of LINDSAY ANN.   LINDSAY ANN's efforts were effective, at 1507-21 there was at least 1200 feet of navigable water available for HANNAH between LINDSAY ANN's stern and the west bank.   Unlike HANNAH, LINDSAY ANN cannot be faulted for her actions up to 1507-21.   Indeed, Rule 17(a)(i) prohibited her from taking any avoiding action.

93.   Inland Rule 17(a)(ii) permitted LINDSAY ANN to take avoiding action as soon as it became apparent to her that the vessel (HANNAH) required to keep out of the way was not taking appropriate action.

94.   But between 1507-21 and 1507-30 HANNAH called LINDSAY ANN and at minimum thanked LINDSAY ANN for her patience holding up during the overtaking. Significantly, HANNAH did not criticize LINDSAY ANN or ask LINDSAY ANN to do anything different than what LINDSAY ANN was doing.   HANNAH did not inform LINDSAY ANN about any steering difficulties or problems HANNAH was experiencing maneuvering downriver.   The relaxed, friendly tone of this communication does not convey any indication at all that HANNAH will not continue altering course to starboard and shape her course to proceed for the midpoint of the open water between LINDSAY ANN and the west bank.

95.   The Court notes between 1506 and 1507-30 the HANNAH had turned to starboard, her COG changing from 45 degrees to 50 degrees, five degrees in just 90 seconds.[85]   Had

---

[85] U.S. Coast Guard VTS AIS, Marquette Ex. 1.

HANNAH simply kept turning at the same rate she did between 1458 and 1502 (about 20 degrees/minute) or as she did after the collision, she had ample time and distance to reach the midpoint, 600 feet off the west bank, thereby keeping well clear of LINDSAY ANN.

96. Thus, Inland Rule 17(a)(ii) was not triggered at 1507-30, less than two minutes before collision.

97. The Court finds Inland Rule 17(a)(ii) was triggered at 1508-20, when the HANNAH in further violation of Inland 13 and Inland Rule 16 stopped turning to starboard, checked her starboard swing, and actually turned almost one degree to <u>port</u>, toward LINDSAY ANN.   This unexpected, unannounced improper action by HANNAH also triggered Inland Rule 17(b), requiring LINDSAY ANN to take action.

98. Having weighed all the evidence, the Court questions what can a huge, nearly stationary, slowly drifting line boat flotilla could do in these circumstances with only one minute and a hundred feet to avoid collision?

99. Up until 1508-20, despite backing full astern and using her flanking rudders hard over, LINDSAY ANN's drift toward the west bank had increased to more than 1.2 knots (120 feet/minute). (Marquette Ex. 1).

100. Backing full astern and steering away from the approaching vessel, as LINDSAY ANN had been doing for several minutes already, is a proper collision avoidance maneuver. But plainly continuing to do so was not going to avoid collision. The alternative would be to try to come ahead and shove away from HANNAH.

101. Several minutes are required for a line boat to shift from full astern, flanking to full ahead, turning – and actually accomplishing positive position change.   During this

transition period, the now unresisted Mississippi River current will and did push LINDSAY ANN's stern even faster and further toward the west bank.

102. LINDSAY ANN's Capt. Clark, reasonably thinking HANNAH had released LINDSAY ANN from the hold up, and relying upon HANNAH to keep turning to starboard, did not notice HANNAH from 1508-20 to 1508-40 was now turning to port toward LINDSAY ANN. But even if he had, his avoiding action would basically be the same as topping around – for both he would need to shift his throttles to full ahead, then wait several minutes for the LINDSAY ANN to gather headway and move forward significantly.

103. At 1508-30, less than a minute before collision, Capt. Clark began to shift his flanking rudders fore and aft, and his main rudders to port. He also shifted the main engine throttles from full astern to stop engine, and then shifted the throttles to full ahead.

104. A large line boat flotilla has tremendous inertia and does not begin to move ahead right away.

105. Before LINDSAY ANN could start making headway, at 1509-02 HANNAH called LINDSAY ANN by VHF radio to announce it looked like HANNAH was going to collide with LINDSAY ANN.

106. LINDSAY ANN's Capt. Clark then made sure the main engine throttles were at full ahead, and he immediately shifted his main rudders to starboard. But there was inadequate time and distance to gain any forward movement or for the shifting of the main rudders from port to starboard to prevent the collision at about 1509-20.

107. In addition, HANNAH cancelled LINDSAY ANN's collision avoidance maneuver when at 1509 HANNAH once again began to turn to port into LINDSAY ANN's stern, her COG vector turning left from 53 degrees to 51 degrees.

108. The Court is mindful of the U.S. Coast Guard Suspension and Revocation Proceedings, and that Capt. Clark accepted charges of misconduct for violating Rule 17, without admission of liability.  This Court, however, has had the opportunity to hear all of the witnesses and weigh all of the evidence.

109. The Court notes the most similar cases, *NATALIE* and *Alter*, do not fault the stand-on vessel under Rule 17 for failing to avoid collision. Nor does this Court.   LINDSAY ANN is to be judged leniently pursuant to the in extremis doctrine, since she was put into peril by HANNAH with less than one minute to react.

110. The Court finds LINDSAY ANN did not violate Inland Rule 17, or any other pertinent Inland Rule, in a manner causative of the collision. Thus, HANNAH is sole fault in this collision.

## Exoneration and/or Limitation of Liability

111. The Limitation of Liability Act, 46 U.S.C. § 30505, provides that "[t]he liability of the owner of a vessel for any claim, debt, or liability … shall not exceed the value of the interest and pending freight."

112. In a Limitation of Liability proceeding, the Court embarks on a two-part inquiry: "[i]nitially, the court must determine [whether any] acts of negligence or conditions of unseaworthiness caused the accident. Second, the court must determine whether the

shipowner had knowledge or privity of the same acts of negligence or conditions of unseaworthiness."[86]

113.   "Privity or knowledge" extends beyond actual knowledge to the knowledge that the ship owners could have obtained by a reasonable investigation at the inception of the voyage.[87]

114.   Concerning property damage matters, a ship owner is generally not charged with the actions or knowledge of its competent crew members or master in the operation of the vessel at sea.[88]

115.   Significantly, where acts of negligence result not from any lack of competence on the part of the crew, but rather are merely mistakes of navigation, the shipowner is entitled to limitation of liability.[89]

116.   Thus, to be permitted to limit its liability, LINDSAY ANN interests must prove that they did not have privity or knowledge of any alleged negligence or unseaworthiness that occurred.

117.   Because the Court finds that regardless of any negligence on the part of the LINDSAY ANN it would have been the result of a mistake of navigation by the LINDSAY ANN's pilot Capt. Clark, LINDSAY ANN interests are entitled to both exoneration from and/or limitation of liability.

---

[86] *Verrett v. McDonough Marine Service*, 705 F.2d 1437, 1444 (5th Cir.1983) (*citing Farrell Lines, Inc. v. Jones*, 530 F.2d 7, 10 (5th Cir.1976).
[87] *The Matter of Central Gulf Lines*, 176 F.Supp.2d 599, 619 (E.D. La. 2001) (*citing Brister v. AWI, Inc.*, 946 F.2d 350, 358 (5th Cir. 1991)).
[88] *See Complaint of Banker's Trust Co.*, 651 F.2d 160 (3rd Cir. 1981), *cert. denied*, 455 U.S. 942, 102 S.Ct. 1436, 71 L.Ed.2d 653 (1982); *Mac Towing, Inc. v. American Commercial Lines*, 670 F.2d 543, 548 (5th Cir. 1982).
[89] *Brister v. A.W.I., Inc.*, 946 F.2d at 356.

118.   In contrast, as set forth above, the Court finds that the SETTOON was operating with an out of date Rose Point navigational chart that could have caused HANNAH's Captain Dean to navigate closer to LINDSAY ANN than she otherwise would have.   This rendered the vessel unseaworthy at the commencement of its voyage.   Accordingly, the Court finds that SETTOON interests are not entitled to exoneration from and/or limitation of liability.

## The Oil Pollution Act

119.   The United States Coast Guard designated HANNAH interests as the responsible party under the Oil Pollution Act ("OPA"), 33 U.S.C. § 2701, et seq.   Under OPA, a claimant may recover for all property damage and economic loss that he/she proves was caused as a result of the spill regardless of HANNAH's   negligence.   Under OPA, unlike the general maritime law, a party may recovery for economic loss even if that party did not sustain physical damage to any property in which that party did not have a proprietary interest.[90]

120.   Significantly, the Shipowners' Limitation of Liability Act, 46 U.S.C. § 30505, does not apply to oil spill claims arising under OPA.[91]   Accordingly, HANNAH interests are not entitled to limit their liability for claims arising under OPA.[92]

121.   Section 2709 of OPA provides HANNAH interests with a right to seek contribution from the LINDSAY ANN to the extent of her negligence.   This contribution claim is governed by the general maritime law.

---

[90] *See also In re Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico, on April 20, 2010*, 808 F.Supp.2d 943, 958-59 (E.D.La.2011) *affirmed* 745 F.3d 157, *cert. denied* 135 S.Ct. 401, 190 L.Ed.2d 307.

[91] *In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on April 20, 2010*, 21 F.Supp.3d 657 (E.D.La.,2014) *citing In re Metlife Capital Corp.,* 132 F.3d 818, 821–22 (1st Cir.1997).

[92] *Id*.

122.   Unlike HANNAH interests' liability for economic losses under OPA, under the general maritime law, the LINDSAY ANN cannot be responsible for any claims for economic loss for which a claimant did not sustain physical damage to property in which it had a proprietary interest.[93]   As a result, to the extent HANNAH interests seeks to recover for any payments it made for economic losses to a party who did not sustain damage to property in which it had a proprietary interest by means of contribution from the LINDSAY ANN, the Court finds that such economic loss claims are dismissed as a matter of law because OPA does not preempt the general maritime law as to economic loss claims against a non-OPA responsible party).[94]

123.   The Court notes that HANNAH interests have contended that they are entitled to a complete defense under OPA as a designated party on the basis that they were not at fault.   Under OPA, such a complete defense by a responsible party requires not only that the responsible party show it was not at fault, but also that (1) the cause of the discharged oil was not the result of an act or omission of a third party whose omission occurred in connection with a contractual relationship with the responsible party; and (2) it exercised due care with respect to the oil concerned and took precautions against foreseeable acts or omissions of a third party who caused the release.

124.   As set forth above, the Court finds that because the HANNAH interests caused the collision by her improper navigation and multiple violations of the Rules of the Road, HANNAH interest are not entitled to a complete defense under OPA.

---

[93] *Plains Pipeline, L.P. v. Great Lakes Dredge & Dock Co.*, 46 F.Supp.3d 632 (E.D.La. 2014).
[94] *Id*.  *See also In re Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico, on April 20, 2010*, 808 F.Supp.2d at 958-62 (holding that OPA did not preempt general maritime law claims against a non-OPA responsible party).

Respectfully submitted,

**PHELPS DUNBAR LLP**


BY:    *Evans Martin McLeod*
            Evans Martin McLeod (Bar #24846)
            David J. Saltaformaggio (Bar #34071)
            Canal Place
            365 Canal Street • Suite 2000
            New Orleans, Louisiana 70130-6534
            Telephone: (504) 566-1311
            Telecopier: (504) 568-9130
            mcleodm@phelps.com
            saltafod@phelps.com

            ATTORNEYS FOR MARQUETTE
            TRANSPORTATION COMPANY, LLC


<u>**CERTIFICATE OF SERVICE**</u>

This is to certify that a copy of the foregoing  was filed on this 1ˢᵗ day of December, 2015 with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to all participating counsel of record.


*Evans Martin McLeod*