UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: SETTOON TOWING, LLC

CIVIL ACTION

NO: 14-499

SECTION: "H"(2)

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This is a limitation action brought by Settoon Towing, LLC, ("Settoon") as owner of the M/V HANNAH C. SETTOON ("HANNAH"), arising out of a collision on the Mississippi River with the M/V LINDSAY ANN ERIKSON ("LINDSAY"), owned by claimant Marquette Transportation ("Marquette"). Marquette has filed a claim in this limitation action, and Settoon has brought a counterclaim against Marquette.

On February 22, 2014, the HANNAH was proceeding downriver from the NuStar facility with 2 barges in tow. After proceeding past College Point, the HANNAH encountered the LINDSAY. The LINDSAY and the HANNAH entered into a one whistle passing agreement in which the LINDSAY agreed to hold-up in the middle of the river until the HANNAH had passed. During the course of the passing, the LINDSAY collided with the HANNAH. The

1

collision caused 750 barrels of light crude oil to be released into the Mississippi River from a tank barge towed by the HANNAH. Settoon was designated as the "Responsible Party" for the oil spill under the Oil Pollution Act ("OPA"). In fulfilling its duties as the Responsible Party, Settoon expended millions of dollars in clean-up costs and other damages.

Settoon alleges that the LINDSAY is responsible for the accident because she violated a passing agreement by beginning to top around before the HANNAH had passed. Marquette alleges that the HANNAH is at fault for the accident by failing to keep clear of the LINDSAY as it was overtaking. Settoon now seeks contribution from Marquette as a third-party tortfeasor for all damages it incurred from the collision and oil spill. This case proceeded to a bench trial on December 15, 2015. Having considered the evidence admitted at trial, the arguments of counsel, and the post-trial briefing, this Court makes the following findings of fact and conclusions of law. To the extent a finding of fact constitutes a conclusion of law, and vice versa, the Court adopts it as such.

## FINDINGS OF FACT

1. At all material times, the LINDSAY was owned and operated by claimant Marquette. The LINDSAY measures 158 feet in length and 42 feet in width. At the time of the collision at issue, the LINDSAY was pushing twenty-one loaded grain barges.
2. At all material times, the HANNAH was owned and operated by Settoon. The HANNAH is a towing vessel measuring about 85 feet in length and 35 feet in width. At the time of the collision at issue, the

HANNAH was pushing two tank barges, including the barge E2-MS303, which was 297 feet in length and 54 feet in width.

3. At all material times, Settoon was a limited liability company organized under the laws of Louisiana with its principal place of business in Pierre Part, Louisiana.

4. At all material times, Marquette was a limited liability company organized under the laws of Delaware with its principal place of business in Paducah, Kentucky.

5. At all material times, the HANNAH was under the command of Captain Calvin Dean, and the LINDSAY was under the command of Captain David Clark.

6. Compared with the LINDSAY, the HANNAH is the smaller, more maneuverable vessel.

7. On February 22, 2014, both vessels were heading southbound in the Lower Mississippi River. The HANNAH had passed through College Point and the LINDSAY was stationed south of College Point preparing to "top around" with the help of a towboat, the SAFETY GLORY, in order to drop off three of its barges at AEP River Operations' barge fleet facility on the east bank of the river. The "top around" was planned to turn the vessel to head upriver.

8. On the day of the collision, the weather was good and skies were clear.

9. Prior to the collision, the LINDSAY successfully completed a hold-up agreement with another vessel, the DENNIS HENDRIX. At 14:42, the captains of those vessels had the following radio communication in

which the DENNIS HENDRIX confirmed that he was being released from the hold-up and could safely continue navigation:

LINDSAY: Thank you there, Cap. Have a good one.

DENNIS HENDRIX: I can come ahead on it?

DENNIS HENDRIX: I can come ahead on it?

LINDSAY: Fine by me.

10. At approximately 14:58, the HANNAH contacted the LINDSAY via radio and entered into a one whistle passing agreement. The vessels agreed that the HANNAH would overtake the LINDSAY, passing her on her port side and that the LINDSAY would hold her course and ground until the HANNAH had passed before beginning the top around.

11. The HANNAH increased her speed upon passing College Point and heading toward the LINDSAY.

12. As she approached the LINDSAY, the HANNAH took slight steers toward the west bank. The LINDSAY was positioned in preparation for a barge drop-off on the east bank.

13. Captain Dean intended to steer the HANNAH midway between the LINDSAY and the west bank of the Mississippi River. He intended to pass with 300 to 400 feet between the vessels.

14. At this point, the river is approximately 3,000 feet across.

15. Between approximately 15:02 to 15:05, the LINDSAY held her position in the river. During that time, she was drifting slightly toward the west bank. Her distance from the west bank at 15:02 was 1573 feet;

    her distance at 15:05-30 was 1453 feet, a distance of 120 feet over three and a half minutes. Her speed throughout this time was 0 knots.

16. The current of the Mississippi River on the day of the accident was approximately 3 to 3.5 mph.

17. At 15:07-21, the HANNAH had not yet passed the LINDSAY. At that time, however, the vessels had the following communication:

    HANNAH: Appreciate your patience there Lindsay Ann, y'all have a good evening, Hannah.

    LINDSAY: No problem there Hannah, y'all have a safe one on down.

18. As testified by Captain Hilton, Marquette's credible navigation expert, there is a custom on the Mississippi River in which a vessel can release another vessel from an agreement through an acknowledgement and confirmation. The HANNAH's communication to the LINDSAY in which Captain Dean stated "appreciate your patience there Lindsay Ann" was an acknowledgement and operated to release the LINDSAY from the hold-up agreement. Captain Clark's response, "no problem there Hannah," was a confirmation of that release.

19. At some point before the HANNAH had completed her overtaking, the LINDSAY began her top around, as evidence by the swing meter on the Rose Point navigation system and an increase in speed. From 15:07 to 15:09-20, the LINDSAY's speed steadily increased from 0.6 knots to 1.8 knots, and she moved 281 feet closer to the west bank.

20. Prior to beginning the top around, one of the crewmembers of the LINDSAY informed Captain Clark that it looked like the HANNAH was going to "pass close" to the LINDSAY.

21. Captain Clark served as lookout for the LINDSAY. He did not look to visually see if the HANNAH had passed after he received the release and before he began his top around.

22. Captain Dean became concerned when the LINDSAY continued to reverse into the path of the HANNAH. At 15:09-03, the HANNAH alerted the LINDSAY via radio that it looked like the LINDSAY may hit the HANNAH.

23. At about 15:09-20, the collision occurred. The stern of the LINDSAY hit the portside of the HANNAH's barge, the E2-MS303, causing 750 barrels of light crude oil to spill into the Mississippi River.

24. As a result of the incident, approximately 70 miles of the Mississippi River were shut down to traffic for almost 48 hours.

25. Settoon was designated as the "Responsible Party" for the oil spill under the Oil Pollution Act. In fulfilling its duties as the Responsible Party, Settoon has expended millions of dollars in clean-up costs and other damages.

## CONCLUSIONS OF LAW

1. The Court has admiralty jurisdiction over this matter, pursuant to 28 U.S.C. § 1333 and the parties' Rule 9(h) declaration. Venue is proper because a substantial part of the events giving rise to this claim occurred in this judicial district. 28 U.S.C. § 1391(b).

2. The Inland Navigation Rules govern the conduct of vessels navigating in this portion of the Mississippi River. 33 C.F.R. § 83.01.

3. To establish maritime negligence, the plaintiff bears the burden of proving by a preponderance of the evidence that: (1) the defendant owed the plaintiff a duty; (2) the defendant breached that duty; (3) the plaintiff sustained an injury; and (4) the breach caused the plaintiff's alleged injuries. *See Canal Barge Co. v. Turco Oal Co.*, 220 F.3d 370, 376 (5th Cir. 2000). "The applicable standards of care in a collision case stem from the traditional concepts of prudent seamanship and reasonable care, statutory and regulatory rules, and recognized customs and uses." *Stolt Achievement, Ltd. v. Dredge B.E. LINDHOLM*, 447 F.3d 360, 364 (5th Cir. 2006). A finding that a captain has violated the Inland Rules may constitute negligence and impose liability on the captain's employer. *In re Blessey Enterprises, Inc.*, No. 08-4282, 2010 WL 3720906, at *4 (E.D. La. Sept. 9, 2010). "Establishing liability in a collision case is eased by the *Pennsylvania* rule, which provides that when a vessel is in violation of a statutory duty, the burden is on the offending vessel to prove that its conduct did not and could not have caused the collision." *Stolt Achievement, Ltd.*, 447 F.3d at 364.

4. Applying the laws and the facts established at trial, the Court finds that as a matter of law both Captain Dean and Captain Clark were negligent in causing the collision. Settoon and Marquette are vicariously liable for the negligence of their captains, respectively. Their negligence is further detailed herein.

### A. Captain Dean's Negligence

5. At all material times, the HANNAH and the LINDSAY were in an overtaking situation as governed by Inland Rule 13, which states that "any vessel overtaking any other shall keep out of the way of the vessel being overtaken." 33 C.F.R. § 83.13.

6. The overtaking agreement was further governed by Inland Rule 16, which states that "[e]very vessel which is directed to keep out of the way of another vessel shall, so far as possible, take early and substantial action to keep well clear." 33 C.F.R. § 83.16.

7. Captain Dean violated Inland Rules 13 and 16 by failing to steer substantially toward the west bank and navigate the HANNAH midway between the west bank and the LINDSAY as intended. In overtaking the LINDSAY, the HANNAH navigated too close to the overtaken vessel, especially in light of the LINDSAY's drift toward the west bank. An "overtaking vessel, must give the one ahead such wide berth as to avoid any contingencies that might arise such as sheering by the vessel caused by suction, current or tide." *Elmini Lama, Inc. v. Tug Natalie Eymard*, 567 F. Supp. 438, 440 (E.D. La. 1983). The HANNAH's captain violated his duty to give the LINDSAY this wide berth. After releasing the LINDSAY from the hold-up agreement, the HANNAH was between 1100 and 975 feet from the west bank of the River. Captain Dean had substantial room to navigate closer to the west bank in order to pass the LINDSAY at a safe distance.

8. Captain Dean was also negligent in releasing the LINDSAY from the hold-up agreement before the HANNAH had safely completed the overtaking. In light of the custom on the Mississippi River in which a vessel can release another from an agreement through the use of a confirmation or pleasantry, such as "Thank you, have a nice day," Captain Dean was negligent in radioing to the LINDSAY "appreciate your patience there Lindsay Ann, y'all have a good evening" before completing the overtaking.

9. Accordingly, the Court finds as a matter of law that Captain Dean was negligent in navigating the HANNAH too closely to the LINDSAY during the overtaking and in releasing the LINDSAY from her hold-up before safely completing the overtaking.

**B. Captain Clark's Negligence**

10. Despite this Court's recognition of a custom in which a vessel may be released from an agreement through use of a confirmation or other pleasantry, this Court holds that such a custom does not relieve either party of their statutory obligations under the Inland Rules. "As a general matter, '[c]ourts do not favor giving effect to local customs involving deviations' from the rules of navigation, and they make an exception only when the customs 'are firmly established, and well understood.' A custom will be recognized only if it does not conflict with the rules of navigation. Custom that contradicts a statutory rule of navigation will not be enforced." *Hal Antillen N.V. v. Mount Ymitos MS*, 147 F.3d 447, 451 (5th Cir. 1998). The custom identified herein is not so well understood as to allow deviation from the Inland Rules.

Indeed, Captain Hilton was unable to provide this Court with any specific terminology that operated as a release, stating that he has heard anything from "I appreciate it, have a good day" to "Thank you. Geaux Tigers."[1] The inexact nature of this custom is further evidenced by the LINDSAY's conversation with the DENNIS HENDRIX on the day of the accident in which the DENNIS HENDRIX twice asked the LINDSAY if it could continue navigation even after the LINDSAY had released it through use of a pleasantry. Accordingly, the custom identified by this Court does not warrant deviation from the rules of navigation.

11. Accordingly, despite being released from its agreement to hold-up by the HANNAH, the LINDSAY was in violation of Inland Rule 17 when she began to top around before the HANNAH had completed her overtaking. Inland Rule 17 provides that "[w]here one of two vessels is to keep out of the way, the other shall keep her course and speed." 33 C.F.R. § 83.17. The Court finds that the LINDSAY did not maintain her course and speed when she began to top around before the HANNAH had safely passed her. In light of this holding, this Court declines to make a finding of fact as to the precise time at which the LINDSAY began the top around—that is, whether it began before or after the HANNAH's release. The fact that the LINDSAY began her top around before the HANNAH had safely passed is dispositive.

12. Further, Captain Clark negligently violated Inland Rule 5, which states that "[e]very vessel shall at all times maintain a proper look-out

---

[1] Transcript, Doc. 129, p. 154.

by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and of the risk of collision." 33 C.F.R. § 83.05. Captain Clark admitted that he did not look to determine the location of the HANNAH before he began his top around, even after receiving a warning from his crewmate that it appeared that the HANNAH may pass closely. If he had turned to look, Captain Clark would have seen that the HANNAH had not yet passed the LINDSAY and completed the overtaking, and he would have thus recognized the risk of collision in beginning to top around. Accordingly, this Court finds that Captain Clark breached his duty to perform a proper look out and was negligent in beginning the top around without first looking behind him to determine the HANNAH's location.

13. The Court finds as a matter of law that Captain Clark was negligent in failing to maintain his course and speed as required by the passing agreement, by beginning a top around maneuver before the HANNAH had safely passed, and by failing to look for the HANNAH before beginning the top around.

**C. Allocation of Fault**

14. "Where both parties to a collision are in violation of statutes designed to prevent collisions, the court may apportion fault between the parties, unless either party proves that its statutory violation was not a substantial contributing cause of the collision. Even without a statutory violation, liability may be imposed simply where there is

11

...

negligence." *Stolt Achievement, Ltd. v. Dredge B.E. LINDHOLM*, 447 F.3d 360, 364 (5th Cir. 2006). "Apportionment is not a mechanical exercise that depends upon counting up the errors committed by both parties. The trial court must determine, based upon the number and quality of faults by each party, the role each fault had in causing the collision." *Id.* at 370.

15. The Court finds that the allocation of fault is as follows: Captain Dean and Settoon are 35% at fault for the accident; Captain Clark and Marquette are 65% at fault for the accident.

 **D. Liability under the Oil Pollution Act of 1990**

16. The "OPA is a comprehensive statute addressing responsibility for oil spills, including the cost of clean up, liability for civil penalties, as well as economic damages incurred by private parties and public entities." *In re Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico*, on Apr. 20, 2010, 808 F. Supp. 2d 943, 959 (E.D. La. 2011*) aff'd sub nom. In re DEEPWATER HORIZON*, 745 F.3d 157 (5th Cir. 2014). "[O]ne major remedial purpose of OPA was to allow a broader class of claimants to recover for economic losses than allowed under general maritime law." *Id.* Prior to the enactment of the OPA, "claims for purely economic losses unaccompanied by physical damage to a proprietary interest were precluded under *Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303 (1927)." *Id.* The OPA now permits claims for economic damages regardless of whether they are connected to a claim for physical damages. 33 USC § 2702(b)(2)(E).

> Another obvious purpose of OPA was to set up a scheme by which a "Responsible Party" (typically the vessel or facility owner) was designated and made strictly liable (in most instances) for clean up costs and resulting economic damages. The intent is to encourage settlement and reduce the need for litigation. Claimants present their claims to the Responsible Party, who pays the claims and is then allowed to seek contribution from other allegedly liable parties. 33 U.S.C. §§ 2709, 2710, 2713. *In re Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico, on Apr. 20, 2010*, 808 F. Supp. 2d at 959.

17. Settoon was deemed the Responsible Party for the February 22, 2014 oil spill and has both clean-up costs and claims for purely economic damages. It now seeks contribution from Marquette—whom this Court has deemed 65% at fault—for those amounts. In doing so, this Court is asked to address a question of first impression: whether a Responsible Party is entitled to contribution for purely economic damages from a third-party found to be partially liable.

18. The OPA provides the Responsible Party with actions in both contribution and subrogation. Section 2709 of the OPA states that "[a] person may bring a civil action for contribution against any other person who is liable or potentially liable under this Act or another law." Section 2702(d)(1)(B) provides that a Responsible Party is entitled by subrogation to recover removal costs or damages from a third party "if the responsible party alleges that the discharge or threat of a discharge was caused solely by an act or omission of [the] third party."

19. If Marquette had been found to be solely liable for the collision, it would be liable for the full amount of damages—including purely economic damages.

20. Marquette argues that it should not be made to share in the liability for purely economic damages, however, because it was found to be only partially at fault. Section 2709 of the OPA permits the Responsible Party to seek contribution either (1) under the OPA, or (2) under another law, such as general maritime law. Marquette argues that it can only be found liable "under the OPA" if Settoon can prove it is solely liable in accordance with section 2702. Therefore, it claims that any claim that Marquette is partially liable must be made under general maritime law. Marquette then contends that because *Robins Dry Dock* prohibits the recovery of damages for purely economic losses under general maritime law, Settoon cannot seek contribution for those amounts from it. Specifically, Marquette states that:

    > "Under this Act," in section 2709, refers to a contribution claim against a third party solely at fault under section 2702(d)(1)(A), in which case the third party is treated as a responsible party and OPA is the governing law. "Or any other law", as relevant here, refers to a partially-at-fault third party, in which case the third party may not be treated as a responsible party under OPA, and general maritime law governs. R. Doc. 84.

21. This Court holds that Marquette's reading of the OPA is overly restrictive and disregards the intent of the statutory scheme. At the outset, this Court can divine no reason why, in enacting a statutory scheme that holds one party strictly liable for purely economic

14

damages regardless of fault, Congress would have then failed to provide that party with an avenue by which to seek contribution from a party who shares in the fault. Further, when the OPA is read as a whole, Marquette's argument is counter to its intent and in some circumstances could lead to absurd results.

22. This Court disagrees with Marquette's belief that "under this Act" in section 2709 refers only to a situation where the Responsible Party seeks to hold a third-party solely liable. Indeed, the legislative history indicates that this was not Congress's intent:

> The Conferees note that this section [2709] might come into play in an instance where more than one party is involved with a spill. For example, a spill may occur when oil is being transferred between a vessel and an onshore facility. If the discharge comes from the vessel, it is the vessel that will be the responsible party for purposes of the Conference substitute. Nevertheless, if action or omission of the onshore facility contributed to the discharge, the operation of this section or section [27]15 on subrogation could result in the facility being held accountable financially *in part or in whole*. H.R. CONF. REP. 101-653, 111, 1990 U.S.C.C.A.N. 779, 789

Clearly, Congress intended to create an action for contribution under the OPA through which the Responsible Party could hold a third party partially liable for the amounts it had been required to pay. The Congressional intent does not support Marquette's narrow reading of the OPA in which liability can be shifted to a third party under the OPA only when it is determined that it is solely at fault. Accordingly, this Court rejects Marquette's argument that Settoon's contribution claim must arise under general maritime law.

15

23. Further, Marquette's argument is inconsistent with the OPA when it is read as a whole. Indeed, section 2710—which discusses indemnification agreements—states that "[n]othing in this Act . . . bars a cause of action that a responsible party subject to liability under this Act, or a guarantor, has or would have, by reason of subrogation or otherwise, against any person," indicating the Act's commitment to allowing the Responsible Party to seek contribution from other parties.

24. Accordingly, this Court finds as a matter of law the OPA intended to allow a Responsible Party to seek contribution from a partially liable third party for all amounts it was required to pay as a result of an oil spill, including those for purely economic losses.

25. Pursuant to 33 U.S.C. § 2709 of the OPA, Settoon is entitled to contribution from Marquette for 65% of all amounts—including those for purely economic damages—that Settoon was required to pay as the Responsible Party for the oil spill that resulted from the February 22, 2014 collision.

### E. Limitation of Liability under the OPA

26. Under section 2704 of the OPA, a Responsible Party may limit its liability relative to its tonnage, unless the "incident was proximately caused by—(A) gross negligence or willful misconduct of, or (B) the violation of an applicable Federal safety, construction, or operating regulation by, the responsible party, [or] an agent or employee of the responsible party." 33 U.S.C.A. § 2704 (West).

27. Above, this Court held that Captain Dean failed to give the LINDSAY a wide berth while passing her in violation of Inland Rules 13 and 16. Accordingly, Captain Dean violated a safety regulation, which was a proximate cause of the collision. Settoon is therefore precluded from limiting its liability under the OPA.

### F. The Limitation of Liability Act

28. In this matter, both Settoon and Marquette seek limitation of liability under the Limitation of Liability Act for damages other than those recoverable under the OPA. The Limitation of Liability Act provides in relevant part that "the liability of the owner of a vessel for any claim, debt, or liability described in subsection (b) shall not exceed the value of the vessel and pending freight." 46 U.S.C. § 30505 (West). "The determination of whether a shipowner is entitled to limitation employs a two-step process. First, the court must determine what acts of negligence or conditions of unseaworthiness caused the accident. Second, the court must determine whether the shipowner had knowledge or privity of those same acts of negligence or conditions of unseaworthiness." *Farrell Lines Inc. v. Jones*, 530 F.2d 7, 10 (5th Cir. 1976). Once, as here, negligence of the vessel has been established, the owner can limit its liability only by proving "it lacked privity or knowledge of the condition." *Petition of Kristie Leigh Enterprises, Inc.*, 72 F.3d 479, 481 (5th Cir. 1996)

29. Here, the Court has found negligence on the part of Settoon through the navigational errors of its captain. "Ordinarily errors in navigation

or other negligence by master or crew are not attributable to (the shipowner) for limitation purposes." *Mac Towing Inc. v. Am. Commercial Lines*, 670 F.2d 543, 548 (5th Cir. 1982) (internal quotations omitted). Accordingly, the Court holds that Settoon lacked privity or knowledge of the mistakes in navigation made by Captain Dean. Therefore, to the extent that any non-OPA damages sustained exceed the value of the HANNAH, Settoon is entitled to limit its liability to the value of the HANNAH.

30. Likewise, the Court has found negligence on the part of Marquette through the navigational errors of its captain. Accordingly, the Court holds that Marquette lacked privity or knowledge of the mistakes in navigation made by Captain Clark. Therefore, to the extent that any non-OPA damages sustained exceed the value of the LINDSAY, Settoon is entitled to limit its liability to the value of the LINDSAY.

## CONCLUSION

For the foregoing reasons, this Court finds that both captains were negligent in the February 22, 2014 collision and oil spill. Marquette shall bear 65% of the full amount of damages sustained, while Settoon shall bear the remaining 35%. Both parties are entitled to limitation of liability under the Limitation of Liability Act, but Settoon shall not be entitled to limitation under the OPA.

New Orleans, Louisiana this 21st day of March, 2016.

_____
**JANE TRICHE MILAZZO**
**UNITED STATES DISTRICT JUDGE**